Kirby H. JACKSON and Robert L. Phinney, Appellants,

v.

C. E. KING and Juanita M. King, Appellees.

No. 15403.

United States Court of Appeals Fifth Circuit.

June 24, 1955.

Russell B. Wine, U. S. Atty., Bradford F. Miller, Asst. U. S. Atty., San Antonio, Tex., C. Moxley Featherston, Ellis N. Slack, Special Assts. to Atty. Gen., H. Brian Holland, Asst. Atty. Gen., for appellants.

W. B. Browder, Jr., Midland, Tex., Marvin K. Collie, John G. Heard, Houston, Tex., for appellees.

Before TUTTLE, CAMERON and JONES, Circuit Judges.

TUTTLE, Circuit Judge.

The question presented in the court below was whether the appellees realized ordinary income or capital gains from the sale of 49 houses in 1947 and 46 houses in 1948, which were owned by them as community property. Appellees having reported the amounts in question as capital gains, appellants, Acting Collectors of Internal Revenue for the First District of Texas, assessed and collected deficiencies totalling $72,597.01, based on their finding that the houses were held primarily for sale to customers in the ordinary course of trade or business, and that the gains were therefore ordinary income under 26 U.S.C. (1946 Ed.) § 117(j) (1) (B). The taxpayers brought this action under 28 U.S.C.A. § 1340 to recover the sums paid, alleging that they were erroneously and illegally collected. The case was tried to a jury, which returned a special verdict that the houses were held for investment or rental purposes. From a judgment for the taxpayers entered on the verdict, the Collectors appealed, contending that the trial court erred in ordering a jury trial, in failing to make findings of fact, in refusing to grant requested instructions to the jury, and in refusing to direct a verdict for the Collectors.

The complaint was filed October 19, 1953, and answered February 16, 1954; a supplemental complaint was filed May 1, 1954, and the Collectors filed an answer to this on May 14, 1954. No demand for a jury trial was made until May 7, 1954. On May 21 the Collectors moved to strike the taxpayers' demand for a jury trial as not made in compliance with Rule 38(b), Federal Rules of Civil Procedure, 28 U.S.C.A. In a hearing on this motion, the taxpayers took the position that the demand was timely, but that they would not contest the motion and were willing to waive trial by jury. However, the court denied the motion and ordered the case left on the jury docket.

The evidence was largely undisputed, and established these facts:

In 1939 taxpayer C. E. King became a shareholder and president of two corporations, the Clinton Park Development Company and the Country Club Place Company, which bought, developed, and sold residential property in 1940, 1941 and 1942. In 1942 he became president and owner of half the stock of the J. L. Martin Investment Company. That corporation was, at the time King acquired his interest, engaged in the construction of a housing project for defense workers in Texas City, Texas. About 30 houses had then been completed and rented and 20 others were under construction. Thereafter the corporation acquired 272 lots and constructed 270 additional houses. In obtaining F.H.A. loan guaranties and priorities for construction, it agreed that the houses would be built for rental purposes. The houses were constructed for low cost rentals—then $36 to $42 monthly—and wartime substitutes such as black painted screens and plastic plumbing materials were used. Paint was applied with spray guns and began to peel after a short time. About 20 of the first houses completed were rented under leases with options in the tenants to purchase and apply the rental payments on the purchase price. Some time after King became president of the company, he decided that these particular leases were not good business, and the company sent a letter to these tenants informing them that they had to exercise the options within 30 days, and stating: "It is our desire to sell the property and we would be glad to have you exercise your option." A second letter stated: "Inasmuch as we prefer to sell rather

than rent the home, we will hold open the option for another five days  *  *."

The rental business never produced a profit.  Tenants were not of the most desirable type, and owing to a high rate of turnover of tenants, houses were often vacant.  Maintenance costs were also high; and when the 1947 Texas City explosion damaged the houses, the expenses of repair were not fully recovered from the insurers.

The corporation sold 6 houses in 1944 and 22 in 1945.  In July, 1945, King bought the shares of the other stockholders and at the end of August the corporation was liquidated, the unsold houses were conveyed to King, and the corporate liabilities were assumed by him.  The minutes of a stockholders' meeting on August 26, 1945, stated that King "reported on the progress of the July and August sales campaign which he said had not materialized as expected.  He said that only eleven had been sold in spite of all the advertising and effort that had been put forth to make these sales, and that after more than two years of sales effort less than 10% of the units had been sold."  That sales campaign consisted of interviews and letters to all tenants urging them to buy the houses.

In 1946 after the program of financing home purchases for veterans went into effect, King sold 46 houses for $282,-010.91, at a gain of $110,400.17.*  Sales continued at about the same rate in 1947 and 1948, the years here in question.  King sold 49 houses in 1947 for $300,-792.23 at a gain of $135,911.03; and 46 houses in 1948 for $293,135.13 at a gain of $144,550.65.  At these prices, no down payments were required for sales to veterans.  As sales were made, the average overhead costs for each house rented increased.  By 1953 all of the houses had been sold.  King listed the last houses with a real estate agent in 1951 and they were sold by this agent.

In September, 1947, the Office of Price Administration granted King a 15 per cent rent increase on condition that 15-month leases were executed.  King wrote a letter to the tenants saying that if they did not sign the leases the houses would be sold; most of them signed the leases.  He testified that he thought this increase in rent would enable him to continue to rent the property, but later in 1947 "it looked like the thing to do was probably dispose of it and put the money in other rental property as it became vacant."  The 15-month leases did not result in a reduced number of sales, nor in a reduction in the turnover rate of rental tenants.  King testified that he knew in 1947 and 1948 that the project could not be operated profitably as things stood and that it would be necessary to sell some of the properties to maintain and put the houses in good condition; that his intention was then to sell part of the houses in order to raise money for repairs and for other investments, and to hold the remainder for rental.  He said that he hoped in this way to retain about half the project as a profitable rental business.  For every dollar's worth of real estate he sold in Texas City, King said he invested five dollars in rental property nearer Houston.  From 1944 through 1948, the total gain from sales was $541,428.67; over the same period $174,558.62 was expended for maintenance.  Other large expenses were insurance and interest on the mortgage debt.

Dale Hodgson, from 1944 to 1951, the local manager of the project, testified that in the tax years in question, 1947 and 1948, he devoted 15 to 20 per cent of his time to sales work.  He received a salary and a 2½ per cent commission on gross sales.  He said he talked with tenants as they came in to pay their rent,

* In previous litigation, the Tax Court held that this 1946 gain was ordinary income and that the houses were held primarily for sale to customers in the ordinary course of trade or business.  This court held that the Tax Court's findings were not clearly erroneous, and affirmed.  The Supreme Court denied certiorari.  King v. Commissioner, 5 Cir., 189 F.2d 122, certiorari denied, 342 U.S. 829, 72 S.Ct. 54, 96 L.Ed. 627.

about twice a month, and on a few occasions talked with and entertained prospective buyers outside of the office. In 1948 he spent $180 on entertainment of buyers and $1,096 for a country club membership. When people inquired about buying a house, if there were no vacancies in the project at that time, Hodgson took their names and telephoned them when vacancies did occur. He negotiated sales and filled out applications to the Veterans Administration or the F.H.A. as the case might require, turning these over to the loan companies for preparation of all the other necessary documents. Either Hodgson or King made arrangements for Veterans Administration appraisals, and also with the loan companies to do the financing. The Veterans Administration required that the houses sold to veterans be papered, painted, and placed in repair. This expense averaged about $500 in 1947. Sometimes tenants were moved to vacant houses so that the houses they formerly occupied could be sold. This work cost as much as $100 a house, and was supervised by Hodgson.

In 1947 and 1948, no "For rent" signs were put up on the properties, but there were some in 1950 or 1951. In 1946 King ran an advertisement that these houses were for sale, on two or three occasions in the Texas City Sun. No newspaper advertising was done in 1947 or 1948, and the only letter sent in this period was the one in 1947 informing tenants that unless they signed 15-month leases their houses would be sold. In the two years in question there was a heavy demand for houses.

At the close of the evidence the Collectors moved for a directed verdict on the grounds of collateral estoppel and insufficiency of the evidence to support a verdict for the taxpayers. The jury found its special verdict in favor of the taxpayers. The Collectors filed, and the court overruled, a motion for judgment *n. o. v.* or in the alternative for a new trial. We proceed now to consider the several arguments made by the Collectors for reversal of the judgment thereupon entered in the court below for the taxpayers.

1. Sufficiency of Instructions. —The court below refused 13 instructions requested by the Collectors, and gave the following charge to the jury:

"Gentlemen of the Jury:

"This case is submitted to you on special issues, propounded to you in the form of questions, which you will answer from a preponderance of the evidence submitted to you under the rulings of the court, answering the questions by unanimous consent of the jury through your foreman and writing your answers in the space provided therefor following each question.

"By the term 'Preponderance of the Evidence' as used in this charge is meant the greater weight of credible testimony.

"Special Issue No. 1.

"Do you find from a preponderance of the evidence that during 1947 the Texas City property was held by plaintiffs, Mr. and Mrs. King, primarily for investment or rental purposes and not primarily for sale to customers in the ordinary course of their business?

"Answer 'It was held for investment or rental purposes,'

"or 'it was held for sale to customers in the ordinary course of their business' as you may find.

"Answer ........................

"Special Issue No. 2.

"Do you find from a preponderance of the evidence that during 1948 the Texas City property was held by plaintiffs, Mr. and Mrs. King, primarily for investment purposes and not primarily for sale to customers in the ordinary course of their business?

"Answer 'It was held for investment or rental purposes,'

"or 'It was held for sale to customers in the ordinary course of their business' as you may find.

"Answer: ......................"

"You are the exclusive judges of the facts proven, of the credibility of the wit-

nesses, and the weight to be given to their testimony, but the law of the case you will receive from the court as given you and be governed thereby.

"During your deliberations in the jury room you will confine your discussions to the evidence admitted before you under the rulings of the court, and will not mention or discuss any personal experience that any one of you may have had elsewhere."

This charge was clearly inadequate. Rule 49(a), Federal Rules of Civil Procedure, permits submission of special interrogatories to juries only of issues of fact. If the question is a mixed question of fact and law, it may be submitted only if the jury is instructed as to the legal standards which they are to apply. Feldmann v. Connecticut Mutual Life Ins. Co., 8 Cir., 142 F.2d 628, 634. Certainly, the issues submitted here were mixed questions of law and fact. We have many times declared that there are legal principles involved in these issues, to which the findings of the trier of fact must conform. See our most recent discussion of these legal aspects in Goldberg v. Commissioner, 5 Cir., 223 F.2d 709. It is unnecessary to decide which, if any, of the Collectors' requested instructions exactly stated the applicable principles; for in any case it was error to refuse these instructions without explaining to the jury the factors which they were to consider in arriving at the ultimate conclusion.

Furthermore, we agree with the Collectors that the form of the special issues submitted to the jury was misleading. See Scarborough v. Atlantic Coast Line R. Co., 4 Cir., 190 F.2d 935, 938. In importing that the jury should find that the property was held for rental purposes or, in the alternative, that it was held for sale to customers in the ordinary course of business, the instructions did not make it clear that the jury could choose to make neither finding, and that the defendants should prevail if the evidence was so much in equipoise that the jury was left in doubt. The special verdict form requested by the Collectors was similar to that actually submitted, except that the jury was told to answer yes or no. If one compares the choice of a yes or no answer to the question propounded, with the choice between alternative answers which the jury was actually given, the serious extent to which the jury may have been misled is apparent.

■ 2. Sufficiency of evidence.—The Collectors also complain of the refusal of the trial court to direct a verdict in their favor. We do not think the court erred in allowing the issues to go to the jury. Although the facts were largely undisputed, we think that no legal principle compels the findings therefrom of the ultimate fact that the taxpayers were holding the houses for sale in the ordinary course of business. The evidence would no doubt sustain such a finding; actually, the facts were quite similar in King v. Commissioner, 5 Cir., 189 F.2d 122, certiorari denied 342 U.S. 829, 72 S.Ct. 54, 96 L.Ed. 627, in which we affirmed the Tax Court's findings for the Government. But we would also have sustained the contrary finding, for we think this is a conclusion on which men may reasonably differ, the very sort of question on which a jury verdict ought not to be disturbed. The evidence can reasonably be viewed as showing that King decided to liquidate a money-losing venture by the most advantageous and expedient means, retaining as much of the investment as he could operate profitably; and not primarily to make profits on the sales.

■ The Collectors insist that the principle of collateral estoppel required the court below to direct a verdict, because of the prior adjudication that the gains on the sales of houses in 1946 were ordinary income, in King v. Commissioner, supra. They cite Commissioner of Internal Revenue v. Sunnen, 333 U.S. 591, 68 S.Ct. 715, 92 L.Ed. 898, in support of this contention. However, the Sunnen case seems to us to be directly to the contrary, requiring us to hold that collateral estoppel does not apply with respect to the sales in 1947 and 1948, because the earlier litigation involved the gains on

different transactions in 1946, however similar they may have been.

"But if the relevant facts in the two cases are separable, even though they may be similar or identical, collateral estoppel does not govern the legal issues which recur in the second case. Thus, the second proceeding may involve an instrument or transaction identical with, but in a form separable from, the one dealt with in the first proceeding. In that situation, a court is free in the second proceeding to make an independent examination of the legal matters at issue. * * *

"It is readily apparent in this case that the royalty payments growing out of the license contracts which were not involved in the earlier action before the Board of Tax Appeals and which concern different tax years are free from the effects of the collateral estoppel doctrine. That is true even though those contracts are identical in all important respects with the 1928 contract, the only one that was before the Board, and even though the issue as to those contracts is the same as that raised by the 1928 contract. For income tax purposes, what is decided as to one contract is not conclusive as to any other contract which is not then in issue, however similar or identical it may be." Commissioner v. Sunnen, 333 U.S. 591, 601–602, 68 S.Ct. 715, 721, 92 L.Ed. 898.

We find no merit in the Collectors' contention that a verdict should have been directed for them.

■ 3. Propriety of jury trial and the absence of Findings of Fact by the court.—The Collectors contend that the trial court exceeded its authority in ordering the case to remain on the jury docket and in overruling their motion to strike the taxpayers' allegedly untimely demand for a jury trial, since both parties requested that the case be tried to the court without a jury. Rules 38(b), 38(d), 39(a) and 39(b), Federal Rules of Civil Procedure; 5 Moore's Federal Practice (2d Ed.) § 39.08. Since we must for other reasons reverse and remand the case for a new trial, it is unnecessary for us to decide whether this was proper on the part of the trial court. If taxpayers desire a jury trial when the case is remanded, they may file a motion under Rule 39(b), in which event the trial court unquestionably has discretion to order a trial by jury.

For like reasons it is unnecessary to our decision to pass upon the Collectors' contention that the trial court should have made findings of fact under Rule 52(a), Federal Rules of Civil Procedure.

The judgment is reversed and the cause remanded for a new trial.