FORD MOTOR COMPANY, Plaintiff-Appellant,

v.

DALLAS POWER & LIGHT COMPANY, Defendant-Appellee.

No. 73–1076.

United States Court of Appeals, Fifth Circuit.

Aug. 21, 1974.

401

B. Thomas McElroy, Dallas, Tex., for plaintiff-appellant.

Robert A. Wooldridge, Jos. Irion Worsham, M. D. Sampels, Dallas, Tex., for defendant-appellee.

Before BROWN, Chief Judge, and GEWIN and GOLDBERG, Circuit Judges.

JOHN R. BROWN, Chief Judge:

This case presents the issue of whether the District Court properly entered judgment for Dallas Power & Light Company (DP&L) based on jury answers to 13 questions submitted pursuant to F.R.Civ.P. 49(a).[1] The jury fixed Ford Motor Company's (Ford)

I. QUESTION NO. 1

Do you find from a preponderance of the evidence that on the occasion in question that the defendant discharged water through its dam in such a manner that the water level on the premises of the Big "D" Auction Co. was higher than it would have been had defendant's dam not been constructed?

Answer: "The water level was higher" or "The water level was not higher".

ANSWER: The water level was not higher.

If you have answered Question No. 1 "The water level was higher", then answer the following question.

QUESTION NO. 2

Do you find from a preponderance of the evidence that such higher water level was a proximate cause of damage to the plaintiff's motor vehicles in question?

Answer: "It was a proximate cause" or "It was not a proximate cause".

ANSWER: ..............

QUESTION NO. 3

Do you find from a preponderance of the evidence that on the occasion in question the defendant discharged water through its dam in such a manner that water rose more rapidly on the premises of Big "D" Auction Co. than water would have naturally risen on said premises had defendant's dam not been constructed?

Answer: "The water rose more rapidly" or "The water did not rise more rapidly".

ANSWER: The water rose more rapidly.

If you have answered Question No. 3 "The water rose more rapidly" then answer this question.

QUESTION NO. 4

Do you find from a preponderance of the evidence that the fact that the water rose more rapidly on the premises of the Big "D" Auction Co. than it would have naturally risen had there been no dam was a proximate cause of the damage to the plaintiff's motor vehicles on the occasion in question?

Answer: "It was the proximate cause" or "It was not the proximate cause".

ANSWER: It was a proximate cause.

QUESTION NO. 5

Do you find from a preponderance of the evidence that on the occasion in question the defendant failed to retain in Mountain Creek Lake that amount of water that a person in the exercise of ordinary care would have retained under the same or similar circumstances?

Answer: "They failed to retain" or "They did not fail to retain."

ANSWER: They did not fail to retain.

If you have answered Question No. 5 "They failed to retain" then answer the following question.

QUESTION NO. 6

Do you find from a preponderance of the evidence that such failure to retain water in Mountain Creek Lake was a proximate cause of the damage to plaintiff's motor vehicles on the occasion in question?

Answer: "It was the proximate cause" or "It was not the proximate cause".

ANSWER: ..............

QUESTION NO. 7

Do you find from a preponderance of the evidence that on the occasion in question the defendant failed to give Big "D" Auction Co. such information concerning the discharge of water through defendant's dam that a person in the exercise of ordinary care would have given under the same or similar circumstances?

Answer: "Defendant failed to give such information" or "Defendant did not fail to give such information".

ANSWER: Defendant failed to give such information.

If you have answered "Defendant failed to give such information" to Question No. 7 then answer this question.

QUESTION NO. 8

Do you find from a preponderance of the evidence that the failure of the defendant to give such information concerning the discharge of water through its dam was a proximate cause of the damage to plaintiff's motor vehicles in question?

Answer: "It was the proximate cause" or "It was not the proximate cause".

ANSWER: It was a proximate cause.

QUESTION NO. 9

Do you find from a preponderance of the evidence that prior to the occasion in question that Big "D" Auction Co. or Ford Motor Co. knew that the premises of Big "D" Auction Co. were subject to flooding?

Answer: "It did know" or "It did not know" as to each company.

ANSWER: Ford did not know.

Big "D" Auction did know.

If you have answered "It did not know" to either company in Question No. 9 then answer this question.

damage at $473,649.00 for flood damages to approximately 650 Ford, Mercury and Lincoln-Continental used automobiles stored on property located below the DP&L Mountain Creek dam.[2] The jury concluded in answers to questions 4 and 8 that the existence of DP&L's dam caused the water to rise more rapidly than if there had been no dam and that the failure of DP&L officials to give adequate warning information of the heavy discharge of flood waters were both proximate causes of the damages suffered by Ford's automobiles. The District Court denied Ford's motion for a judgment on the verdict and entered a take nothing judgment based on the jury's affirmative answers to contributory negligence issues 9, 10, 11 and 12 which the Court concluded barred Ford from any relief on the theory of imputed contributory negligence. We do not think that Ford was entitled to a judgment based on the jury's answers to the special issues but not for the reasons given by the District Court. The findings of the jury, on the special issues submitted, are insufficient to justify a verdict for Ford. We conclude, however, that the District Court failed to submit the case to the jury on the proper theory of liability and we therefore reverse and remand for a new trial.

QUESTION NO. 10

Do you find from a preponderance of the evidence that prior to the occasion in question that Ford Motor Co. in the exercise of ordinary care should have known that the premises of Big "D" Auction Co. were subject to flooding?

Answer: "It should have known" or "It should not have known" as to each company to which you answered "It did not know" in Question No. 9.

ANSWER: Ford, It should have known. Big "D" Auction ...................

If you have answered "It did know" or "It should have known" to either company in Question No. 9 or 10, then answer the following question.

QUESTION NO. 11

Do you find from a preponderance of the evidence that on the occasion in question Ford Motor Co. or Big "D" Auction Co. failed to exercise ordinary care in storing motor vehicles on the premises of Big "D" Auction Co.?

Answer: "It did fail" or "It did not fail" as to each company to which you answered "It did know" or "It should have known" in Question No. 9 or 10.

ANSWER: Ford, It did not fail.

Big "D" Auction, It did fail.

If you have answered "It did fail" as to either company in Question No. 11, then answer this question.

QUESTION NO. 12

Do you find from a preponderance of the evidence that such failure to exercise ordinary care was a proximate cause of the damage to plaintiff's motor vehicles on the occasion in question?

Answer: "It was the proximate cause" or "It was not the proximate cause" as to each company to which you answered "It did fail" in Question No. 11.

ANSWER: Big "D" Auction Co., It was the proximate cause.

If you have answered "It was the proximate cause" in answer to Question No. 2, 4, 6, or 8, then answer this question.

QUESTION NO. 13

What sum of money do you find from a preponderance of the evidence to be the difference in market value in Dallas County, Texas, of the plaintiff's motor vehicles in question immediately before and after the flood in question which was proximately caused by the conduct of the defendant on the occasion in question?

In answering this question you are instructed that by the term "market value" is meant the amount which will be paid in cash by willing buyers who desire to buy, but are not required to buy, to a willing seller who desires to sell, but is of no necessity of selling. You are further instructed that the difference, if any, between the market value before and after the flood in question of the 396 Ford Division motor vehicles in question resold by the plaintiff may not exceed the sum of $65.00 per motor vehicle.

Answer in dollars and cents.

ANSWER: $473,649.00.

2. In its complaint and appellate brief, Ford alleged that flood damages were suffered by over 900 automobiles. The trial record shows that Ford established damages to only 664 automobiles—396 Fords which were repaired, 66 Fords which were beyond repair and donated to a school and 202 Lincoln-Mercurys which were all destroyed. Ford officials admitted at trial that no recoverable damages were suffered by an additional 240 automobiles.

Before discussing either theory of liability, strict liability or negligence, a review is in order of the significant testimony given concerning the location at which the Ford automobiles were being stored, the structure of DP&L's Mountain Creek dam, the manner of its operation and the flood which caused so much damage.

### Big D

At the time of the flood the Ford vehicles were being stored on the premises of the Big D Auto Auction Company (Big D) [3] for reconditioning in preparation for resale. Big D generally dealt directly with auto manufacturers, contracting minor reconditioning work of one year old cars and then auctioning the cars to dealers at wholesale prices. Approximately 12,000 vehicles a year were taken through the Big D facilities and sold at auction. At the time of the flood, there were about 1900 automobiles stored on the Big D lot including automobiles belonging to General Motors, American Motors and Chrysler Corporations.[4]

The Big D property near the suburban city of Grand Prairie was located approximately two miles downstream on Mountain Creek from DP&L's Mountain Creek dam. The terrain of the land was described by experts at trial as flood plain. Big D was back from the Creek about one mile on a large more or less level open area. There was inside storage on the lot for 300 cars and an additional 14 acres of surfaced parking enclosed by industrial fence.

### The Mountain Creek Dam

The Mountain Creek dam was constructed in the mid-1930's to serve as a cooling pond for DP&L's Grand Prairie generating station. It was never intended to be used for flood control purposes. The dam, which is a rolled earth filled structure 5,000 feet long, crosses Mountain Creek, a natural tributary of the Trinity River. Behind the dam a reservoir known as Mountain Creek Lake was formed with a capacity of 22,840 acre feet with a water level of 457 feet above sea level. The sill elevation or lowest elevation of the dam is 431 feet above sea level. The top elevation of the earthen sections of the dam are 467 feet—making the maximum height of the dam 36 feet.

Along the 5,000 foot earthen wall are six metal tainter gates, each 34 feet wide. The gates themselves are only 27 feet high so the six gates make a 204 foot length measured across the front of the dam in which the maximum height is only 458 feet above sea level.[5] To allow the release of water from the lake, each gate opens from the bottom. The gates may each be raised a maximum of six feet creating a total gate opening of 36 feet if all six gates are open to maximum at the same time.[6]

Experts for both Ford and DP&L testified that the tainter gates used in the Mountain Creek Lake dam were not designed for water to go over the top. Any release of water must go under the gates when they are raised.

### Came The Flood

During the late afternoon and evening hours of May 6 and the early morning

---

3. Big D as a separate entity was not a formal party to this litigation and its legal relations with Ford were carried on through C&F Motors, Inc. The evidence clearly establishes that C&F Motors, Inc., was a name used by Big D merely for accounting purposes and we will treat them as one and the same. "Big D"—apparently no shorthand for "Big Dallas"—was the name all witnesses used in referring to the activities and operations on this property.

4. Informally we learn that these automobile companies are waiting in the wings with similar suits.

5. The figure 458 represents the 431 foot base plus the 27 foot tainter gate. This is the normal maximum level of the lake when all gates are closed.

6. Gate openings are described as the sum total of the opening of all six gates. For example, a gate opening of 18 feet could refer to all 6 gates being open 3 feet each or possibly 4 gates open 4.5 feet each.

hours of May 7, the Dallas region received an extremely heavy rainfall.[7] Since the 300 square mile watershed of the Mountain Creek Reservoir is within this region, there was an extraordinary increase in the amount of water discharging into the lake. Experts for DP&L estimated that over 77,000 acre feet of water came through the lake during May 6 through May 8. With a total normal lake capacity of only 22,840 acre feet, large amounts of water were necessarily passed through the dam and down Mountain Creek to the Trinity River.

Crane, the manager of Big D, testified that in spite of the heavy rains during the night of May 6, there were no floodwaters on the Big D property when he arrived at work about 8 a. m. on the morning of May 7. In fact the rains had subsided by that time. Not until around 8:30 a. m. did Big D begin to take some water, thus arousing the concerns of the Big D management. DP&L had been allowing the heavy rain waters to flow through the dam during the evening of May 6 and early hours of May 7. According to DP&L's Assistant Supervisor at Mountain Creek Reservoir, the tainter gates were open to 22 feet at 8 a. m. on May 7. At 9 a. m. the gate opening was 25 feet and by 11 a. m. the opening had been increased to 30 feet. The gates remained open at 30 feet all through the afternoon of the 7th and not until 7 p. m. were they lowered to 28 feet. The downstream flood waters did not crest until between 5 and 6 p. m. on May 7.[8]

Acting on his concern over the rising waters of Mountain Creek, Big D manager Crane called the DP&L generating station on Mountain Creek Reservoir around 8:30 on the morning of May 7. He identified himself and asked for information regarding DP&L's plans as to how long the flood gates would be open and how wide the opening would be. The response of the DP&L employee was that he could not give out any information.[9] Crane testified that he was given a downtown number which he called but again received no information. Finally, Crane contacted Bobby J. Adams, a sergeant in the Grand Prairie Police Department, who was off-duty and asked him to contact DP&L and try to get some information. Adams testified that he called the dam about 9:30 a. m. on May 7 and identified himself and told why he was calling. He also was referred to the downtown complaint de-

---

7. On May 6 the drainage area received rainfall of 4.7 inches. This rain followed the 1.4 inches of rain which fell on the area during the previous day, May 5.

8. This information was determined by Mr. Stuart Vaughn, a civil engineer expert for Ford, who compiled data furnished by the United States Geological Survey which had automatic floats installed on Mountain Creek which indicated the rise and fall of water levels.

9. This was in strict accordance with the elaborate manual prepared by DP&L.
   "Section 3—Verbal Reports to Governmental Agencies; Information Releases to Press, Private Individuals and Companies. NOTE 4—Questions concerning rainfall, lake, or gate openings which are asked by private individuals and/or companies will ONLY be answered by the LCE [Lake Control Engineer] or his designated representative. Only factual data/information will be released. NO opinion will be given concerning the effect of Mt. Creek Lake

release on the Trinity floodway. A caller's identity must be firmly established prior to releasing such information. A memorandum of the conversation will be immediately prepared and will include the date, time, and substance of the conversation."
   An assistant control engineer with DP&L, Mr. W. G. Irby, testified that it was his standard procedure upon receiving calls requesting information to refer the callers to the Lake Control Engineer. He would not give out any information himself nor would he tell the caller the number by which the Lake Control Engineer could be contacted.
   Mr. J. R. Padgitt, a civil structural engineer working for DP&L at Mountain Creek Reservoir, testified he answered a call from Big D about 10 a. m. on May 7 but did not give any information as to future changes in the gate openings nor that there was a likelihood of a large discharge of water during the day. Padgitt acknowledged his familiarity with Big D's location and practice of storing large numbers of cars on what Padgitt considered to be a flood plain.

partment of DP&L. He received no more information than Crane had received on his earlier call.

Unable to obtain any significant information and with waters continuing to increase on the property, Crane, after obtaining permission to park Big D's stock of automobiles on the runways of the nearby Dallas Naval Air Station, ordered all the cars moved off the lot. The operation started about 10:30 a. m. and continued until between 2:00 and 2:30 p. m. when the water rose very rapidly and prevented any of the remaining cars from being removed. During these four hours Big D drafted all 45 employees into service and solicited any additional drivers they could locate. Over 600 of the more than 1900 cars were successfully moved out and escaped water damage. Some of the remaining cars were submerged up over their radiators. Varying degrees of damage were suffered by the automobiles which were trapped on the lot.[10]

### Rulings Of The District Court

Concluding apparently that there was either insufficient evidence to submit the case to the jury on a theory of strict liability or that it did not apply to this situation, the District Judge narrowed the case and based it on a negligence theory of liability. The jury answered affirmatively to the special interrogatories on negligence and contributory negligence finding both the conduct of DP&L and Big D proximate causes of the damages to Ford's automobiles. But on the answers to contributory negligence the Judge imputed Big D's negligence to Ford and denied recovery to Ford.

Ford challenges the Court's judgment under the broad grounds which can be summarized as follows: (i) that the jury properly found DP&L strictly liable

for all damages, (2) that the jury properly found DP&L negligent in failing to warn, (3) that there was insufficient evidence to support the jury's finding of contributory negligence, and (4) that contributory negligence was improperly invoked as a basis for denying recovery to Ford since the acts were either intentional or the case was one of strict liability. as to which contributory negligence does not apply.

■ For the reasons which we will articulate at length, we find that the Court was partly right and partly wrong. Ford apparently thought the issue of strict liability was in the case and was raised and submitted in special interrogatories 3 and 4. The trial Court presumably thought otherwise for it did not distinguish the effect of contributory negligence as to a case of strict liability and ordinary negligence. Having been forced by Ford's contentions to assay the correctness of the effect of contributory negligence on a case of strict liability we conclude that a species of such liability was raised. But we hold that the Court's instructions did not pose questions of this type of strict liability to the jury, although Ford raised contentions of strict liability and submitted requested special issues on strict liability which adequately directed the Court's attention to the proper Texas rule.[11] While our decision on the issue of strict liability precludes the need to reach the other issues on appeal, we feel it is proper for the particular reasons pointed out to respond to the issues of duty to warn and contributory negligence.

### Liability of DP&L

A close analysis of the Court's charge and special issues shows that the only theory of liability submitted to the jury was that of ordinary negligence.[12] Ex-

10. Among the 664 cars which Ford established were damaged, 202 Lincoln-Mercurys were crushed and destroyed after the flood, 66 Fords were donated to a local school and 396 Fords were salable after repairs.

11. The request and refusal prevented a waiver or the right of the trial Judge to make an

express or implied finding in support of the judgment entered. F.R.Civ.P. 49(a).

12. Both below and here Ford asserts that questions 3 and 4 (note 1, *supra*) are a submission on and conclusive finding of so-called strict liability. Ford's contention and the reserved exceptions to the refusal of a

cept for the interrogatories (note 1, *supra*) the charge read to the jury followed the standard Texas pattern with instructions on burden of proof, preponderance of the evidence, ordinary care, proximate cause, credibility of witnesses, etc. Neither the accompanying general charge nor the special interrogatories adequately submitted the theory of liability asserted by Ford, that of "reasonableness" of DP&L's intentional actions in discharging the water which resulted in harm to the Ford automobiles.

### Strict Liability

At the close of the trial, Ford requested, but the trial court refused, a series of special interrogatories basing liability on a theory similar to strict liability (see note 12, *supra*) but actually more in tune with the American Law Institute's theory of liability for intentional acts.[13] Under that theory, the proper test for determining liability of a person who causes harm through intentional acts is a "reasonableness" standard not an "ordinary care" standard as included in the Court's instruction to the jury. See Restatement of Torts §§ 826–831. We believe there was sufficient evidence in the record to support the granting of Ford's requested special issues and instructions.[14] This theory of liability is actually a hybrid of strict liability and we will outline its development in Texas law.

Texas courts originally followed the doctrine of Rylands v. Fletcher, L.R. 3 H.L. 330 (1868), imposing strict liability on the theory that the land owner who impounded waters brought an unnatural peril on to his land. Texas & Pacific Ry. v. O'Mahoney, 24 Tex.Civ. App. 631, 60 S.W. 902 (1900, writ ref'd); Anderson v. Highland Lake Co., 258 S.W. 218 (Tex.Civ.App.1924, no writ). This doctrine of strict liability for damages from impounded waters was finally repudiated by the Texas Supreme Court in Turner v. Big Lake Oil Co., 128 Tex. 155, 96 S.W.2d 221 (1936). In that case the plaintiff's land had been damaged by the *escape* of salt water from ponds

Court to submit the requested issues sufficiently preserve the point for our review and decision.

13. Following are some of these special interrogatories requested by Ford.
Special Issue No. [i] *
Do you find from a preponderance of the evidence that Defendant's conduct in opening its flood gates at its Mountain Creek Dam and overflowing the premises of Big "D" Auto Auction was intentional?
Special Issue No. [ii]
Do you find from a preponderance of the evidence that at the time and on the occasion in question such intentional opening of the flood gates and overflowing of the premises of Big "D" on Defendant's part was unreasonable?
Special Issue No. [iii]
Do you find from a preponderance of the evidence that Defendant, its officers, agents or employees, discharged the waters through Defendant's Mountain Creek Dam in an unnatural and concentrated volume upon the property of the Big "D" Auto Auction?
Special Issue No. [iv]
Do you find from a preponderance of the evidence that at the time and on the occasion in question the waters reaching the Big "D" premises were augmented or made more burdensome by the construction and manner of operation of Defendant's Mountain Creek Dam?
Special Issue No. [v]
Do you find from a preponderance of the evidence that at the time and on the occasion in question Defendant, its officers, agents or employees, diverted the natural flow of the waters in question or impounded such waters in such manner as proximately to cause damage to the property of Plaintiff?
Special Issue No. [vi]
Do you find from a preponderance of the evidence that at the time and on the occasion in question Defendant, its officers, agents or employees, failed to exercise reasonable care so to operate Defendant's dam as to avoid the overflow of Plaintiff's property?
* Numbers [i], etc., are inserted for ease of reference.

14. We speak only in broad terms of the critical doctrinal theories without in any way approving or disapproving the particular form of interrogatories or accompanying instructions. We are careful to state, however, for any subsequent appeal in this case that we do not mean to foreclose completely independent assessment of sufficiency on a record properly submitting the correct theories.

which the defendants had constructed for use in their oil well operations. The Texas Court renounced an absolute liability standard in favor of a negligence test.

From the foregoing it is apparent that we decline to follow and apply in this case the rule of absolute liability laid down in Rylands v. Fletcher, because: (a) The rule has been generally repudiated by this court in Gulf, C. & S. F. R. Co. v. Oakes, 94 Tex. 155, 58 S.W. 999, 52 L.R.A. 293, 86 Am.St. Rep. 835, and Galveston, H. & S. A. R. Co. v. Currie, 100 Tex. 136, 96 S.W. 1073, 10 L.R.A.,N.S., 367; (b) the basis of the rule drawn from its application in England in cases of fire, damage by livestock, and injuries to an innocent bystander have been repudiated by us; (c) the conditions which obtain here are so different from those of England that the rule should not be applied here; (d) and because the rule of negligence, instead of absolute liability, while not obtaining universally in the United States, is of such general application as to constitute, as Thompson says, the "American Rule," in effect the common-law rule as applied in America, which is the common law which we follow rather than that declared by the English courts.

96 S.W.2d at 226.

■ Acknowledging the change in Texas law following *Turner*, Ford asserts, and correctly so, that Texas still recognizes situations in which the ordinary concept of negligence is not a critical factor in assessing liability for water damage. One situation is when a person violates the Texas Surface Water Act, Water Code § 5.086, V.T.C.A., and diverts surface water from its place of natural flow which results in injury to an owner of a lower estate.[15] Other instances in which strict liability continues to be followed are when the defendant creates a nuisance, Sun Co. v. Wyatt, 48 Tex.Civ.App. 349, 107 S.W. 934 (1908, writ dism'd), or when a defendant's actions result in a taking or destruction by a public body of a person's property without adequate compensation therefore being a violation of the constitution, Jefferson County Drainage Dist. v. Langham, 124 Tex. 167, 76 S.W. 2d 484 (1934).

■ While our case does not fall into the category of a violation of the Texas Surface Water Act,[16] nuisance or unconstitutional taking, it nevertheless raises an issue not contemplated in the normal ordinary care-negligence standard of liability. Both parties agree that for an unintentional escape of water, i. e., breaking of a dam or levee, the standard of liability is one of negligence and ordinary care. Can the standard be any less for an intentional discharge of water? The answer obviously is a resounding no. By the very nature of the forces stored, and the likelihood of severe harm from an intended release of waters it stands to reason that the standard of liability should, and must, be a higher one.

---

15. While there is a clear distinction between surface water and water courses (see Restatement of Torts §§ 841, 842 and 846), the difference is not determinative in this case. If liability is based on a violation of the Texas Surface Water Act then the Courts are strict in defining whether the alleged damage was actually done by surface water. Stoner v. City of Dallas, 392 S.W.2d 910 (Tex.Civ.App.1965, writ ref'd, n. r. e.). But when the waters are impounded and subsequently *intentionally* released by the defendant it will not alter the result if the impounded water is classified surface or water course.

16. The Texas definition is not subject to dispute:

Surface water is that which is diffused over the ground from falling rains or melting snows, and continues to be such until it reaches some bed or channel in which water is accustomed to flow. Surface water ceases to be such when it enters a water course in which it is accustomed to flow; for, having entered the stream, it becomes a part of it, and loses its original character.

Stoner v. City of Dallas, 392 S.W.2d 910, 912 (Tex.Civ.App.1965, writ ref'd n. r. e.) quoting with approval from Cairo V. & C. Ry. v. Brevoort, D.Ind., 1894, 62 F. 129, 133.

■■ In City of Houston v. Renault, Inc., 431 S.W.2d 322 (1968), the Texas Supreme Court explained the standard of liability for damages resulting from a substantial invasion of land by another person interfering with the flow of water. The Court clearly stated the two different standards to be applied in determining liability. Its importance to us is the Texas unqualified adoption of the concept of intentional invasion.

According to the American Law Institute, the liability of one who causes an unintentional but substantial invasion of the land of another by interfering with the flow of surface water depends upon whether his conduct was negligent, reckless or ultrahazardous. Where the invasion is intentional, liability depends upon whether the invasion was unreasonable. An invasion is intentional within the meaning of these rules when the defendant acts for purpose of causing it or knows that it is resulting or is substantially certain to result from his conduct. See Restatement, Torts, § 833 and comments thereunder. In our opinion this is the sound and better rule * * *.[17]

■■ Embracing as it did the Restatement concept of intentional invasion, we have almost blinding *Erie* lights that the Court approved as well the meaning of an intentional invasion.

a. *Meaning of "intentional invasion."* To be "intentional," an invasion of another's interest in the use and enjoyment of land need not be inspired by malice or ill-will on the actor's part towards the other. An invasion so inspired is intentional but so is an invasion which the actor know-

ingly causes in the pursuit of a laudable enterprise without any desire to cause harm. It is the knowledge which the actor has at the time he acts or fails to act that determines whether the invasion which results from his conduct is intentional or unintentional. It is not enough to make an invasion intentional that the actor realizes or should realize that his conduct involves a serious risk or likelihood of causing such an invasion. He must either act for the purpose of causing it or know that it is resulting or is substantially certain to result from his conduct.

Restatement of Torts, § 825a.

Clearly, the evidence is such as to warrant a finding of fact,[18] and possibly of law, that the action of DP&L in discharging the waters from the dam through opening of the gates was an intentional act within the meaning of the Restatement. The DP&L engineers operating the dam admitted to their knowledge of the likelihood of substantial harm as a result of the release of water. Wheeler, the Lake Control Engineer, admitted that he realized the water "could easily wreck [sic] a lot of havoc" on the downstream lands. Engineer Padgitt also acknowledged his familiarity with the flood plain terrain of Big D's location.

■■ But unlike strict liability in which liability flows from the act for damage done, it is not enough to show just an intentional invasion (and harm). Liability for that harm depends on whether the intentional invasion was reasonable. The standard of care to be applied is one of reasonableness rather than one of ordinary care. Again we

---

17. This discussion by the Supreme Court which sets forth the proper standard of liability is the highest and most recent authority available and we are *Erie*-bound by it. Ford Motor Co. v. Mathis, 5 Cir., 1963, 322 F.2d 267. While *Renault* involved the diversion of surface waters, as we stated in note 15, *supra*, the distinction is not determinative of the standard of liability to be applied.

18. In an area of newly developing law for Texas the wise course to follow is to submit the requisite interrogatories *with* appropriate accompanying general instructions so that the trial Court, and on appeal, the appellate court can determine legal consequences in the light of the controlling standards. Brown, Federal Special Verdicts: The Doubt Eliminator, 44 F.R.D. 338.

turn to the Restatement definition for factors to be considered in determining if the intentional act was unreasonable.

*a. Unreasonableness in general.* The mere fact that an invasion of another's interest in the use and enjoyment of land is intentional does not mean that it is unreasonable. There are, of course, certain types of intentional invasions which are so uniformly regarded as unreasonable, both in legal and popular opinion, that courts and legislatures have declared them to be so as a matter of law. (See Comment *d*, and §§ 829–831.) Many invasions, however, can be justified as reasonable although the actor knows that they are resulting or are substantially certain to result from his conduct. Fundamentally, the unreasonableness of intentional invasions is a problem of relative values to be determined by the trier of fact in each case in the light of all the circumstances of that case (see § 822, Comment *j*).

*b. The point of view.* The unreasonableness of an intentional invasion is determined from an objective point of view. The question is not whether a reasonable person in the plaintiff's or defendant's position would regard the invasion as unreasonable, but whether reasonable persons generally, looking at the whole situation impartially and objectively, would consider it unreasonable. Regard must be had not only for the interests of the person harmed but also for the interests of the actor and for the interests of the community as a whole. Determining unreasonableness is essentially a weighing process, involving a comparative evaluation of conflicting interests in various situations according to objective legal standards.

Restatement of Torts § 826a and b.

The weighing process between the competing interests is expressed in the Restatement as a legal evaluation between the "gravity of harm" and the "utility of the conduct." Without intimating any holdings either in fact or

law we outline some of the factors. No one could challenge the utility of the existence of DP&L's dam, providing an essential element in the production of a vital public service. But the inquiry involves also the manner of conduct by DP&L's employees in the operation of the dam. Thus, it has been admitted that the DP&L employees knew the large discharge of water would most probably cause flooding on Big D's property. The question would arise therefore whether it would have been practicable for DP&L to prevent or avoid in part this harm and still achieve their purpose of controlling the flood waters, protecting their dam and reservoir for its beneficial use and avoiding needless harm to others.

An invasion is practically avoidable if the actor, by some means, can substantially reduce the harm without incurring prohibitive expense or hardship. Thus if the actor can carry on his activity with more skill or care, or in a different manner, or at a different time, and thereby avoid a substantial part of the harm without substantially diminishing the value of his own enterprise, the invasion is practicably avoidable. Or, if he can do something in addition to what he is now doing which would eliminate a substantial part of the harm without prohibitive expense, the invasion is practicably avoidable. But where he would have to abandon his activity, or incur expense or hardship of such magnitude that it would be considerably less profitable to continue, in order to reduce the harm materially, the invasion is not practicably avoidable.

In cases involving intentional invasions it is improper to speak of the actor as being negligent in failing to avoid the interference where it would be practicable for him to do so, since negligence has reference only to unintentional harms (see § 282, Comment *c*, vol. II). Where an invasion is unintentional, however, it is proper to speak of the actor's failure to take

proper precautions to avoid the harm as negligence.

Restatement of Torts § 828g.

■■ We hold that Ford adequately established facts which would have justified submission by the Court to the jury of instructions and issues on the theory of liability for an intentional act. The Court failed to give any instructions on the theory of the case and the basic theories of liability encompassed in Ford's contentions and requests. Jackson v. King, 5 Cir., 1955, 223 F.2d 714.

### Negligence of DP&L

#### Generally

If on retrial the evidence does not result in or permit a finding of intentional invasion then of course the ultimate theory will be that of negligence-ordinary care. Since the submission of the case, over objections of Ford, did not cover one critical theory we expressly make no assessment of the appropriateness of the issues as framed [19] (see note 1, *supra*) or the sufficiency of the evidence on general notions of negligence. That must await the retrial and any appeal on that record.

#### Duty To Warn Big D

While we express no opinion as to the sufficiency of the evidence on the question of whether DP&L negligently failed to disclose adequate information to Big D concerning the discharge of water through the dam, we are of the opinion, contrary to DP&L's contention, that DP&L did owe the downstream property owners some duty of giving appropriate warning. (See special issues 7 and 8, note 1, *supra*).

■ Questions 7 and 8 which posed the issue of liability based on the theory of negligence in failing to give Big D information regarding the amount of water it would discharge raises the question of whether Texas law imposes on DP&L a duty to warn. Texas law does recognize a duty to warn on the part of the person who creates a dangerous situation, although without negligence on his part. Buchanan v. Rose, 138 Tex. 390, 159 S.W.2d 109, 110 (1942). The Supreme Court in *Buchanan* stated:

> We think it may also be said that if one by his own acts, although without negligence on his part, creates a dangerous situation * * * the one creating the same must give warning of the danger or be responsible for the consequences.[20]

This rule has been acknowledged in subsequent Texas cases. E. g., Henderson v. Willmon, 407 S.W.2d 24, 27 (Tex.Civ. App.1966, writ dism'd); Courville v. Home Transportation Co., 497 S.W.2d 788, 791 (Tex.Civ.App.1973); Page v. Scaramozi, 288 S.W.2d 909, 911 (Tex. Civ.App.1956, writ ref'd n. r. e.); City of Austin v. Schmedes, 270 S.W.2d 442, 446 (Tex.Civ.App.1954), aff'd in part, rev'd in part, 1955, 156 Tex. 416, 279 S. W.2d 326.

■ Applying the *Buchanan* rule to the case of DP&L poses no problems.

---

19. Since the Court's general instructions pertained only to the definition of negligence, proximate cause and a few other legal terms plus the jury's function in resolving conflicts, the charge, following the traditional state court practice of bare bones questions, is perilously close to the error in Jackson v. King, 5 Cir., 1955, 223 F.2d 714. The beauty of F.R.Civ.P. 49(a) is that it allows, as it should, the ready means of giving in a general charge manner full instructions on theories, contentions, etc. See Brown, Federal Special Verdicts: The Doubt Eliminator, 44 F.R.D. 338.

20. The Supreme Court did not find liability in *Buchanan* since the defendant had not *created* the dangerous situation but was merely aware of the danger and failed to warn. Texas is among those jurisdictions which recognize a duty to warn only on the part of the person who has some operational responsibility for the existence of the situation having dangerous potentialities. Mere knowledge of a dangerous situation or helpless condition of another person only imposes a moral duty to warn or render aid but not a legal duty. Boyer v. Gulf, Colorado & Santa Fe Ry., 306 S.W.2d 215, 220 (Tex. Civ.App.1957, writ ref'd n. r. e.).

To be sure, DP&L did not create the flood. But it created, maintained and operated the dam, the presence of which posed nearly all of the problems of proper conduct. Moreover, DP&L was in effect a monitor of the flood waters. Its Mountain Creek dam impounded the flood waters and, within the physical limits of the tainter gates, DP&L employees controlled the rate and flow of the discharge of the water and were the only ones who could accurately determine the amount of water which was, and would be, flowing through the reservoir and down Mountain Creek.[21] While this information was available for quick access to the DP&L engineers, it was not available to the general public.

Employees of DP&L who worked at the Mountain Creek Reservoir attempted to justify their failure to offer information concerning the operation of the dam during the flood on the ground that the operating manual prescribed that the Lake Control Engineer would be the sole source of information in response to all requests for information. (See note 9, *supra*). Furthermore, they testified that they had no knowledge as to what the discharge rate would be beyond the time of the specific phone inquiries.[22]

With this operational control over the instrumentality having damaging potentialities, the means of knowledge on existing conditions and likely future developments, and the capacity to make assessments on what would be done and the consequences thereof, DP&L had a duty to give such warning to Big D as would an ordinarily prudent person. The existence of the duty is even more demanded as to one (Big D) who actively seeks, but is denied, information.

21. DP&L controlled an extensive monitoring system through which it could anticipate the amounts of water coming into the reservoir and also the amount of water being released from the spillway on its way to the Trinity River. Included in this system were upstream telemarker stations which the DP&L engineers could contact by telephone and immediately receive accurate data as to the elevation of the water in the major creeks flowing into the reservoir. There were also eight different DP&L rain gaugers hired by contract to transmit specific information as to the amounts of rain being received in their areas. The engineers could also dial directly and receive the elevation of the spillway and information on the amounts of water being released.

22. J. R. Padgitt, a civil engineer for DP&L who received the 10 a. m. call at the reservoir from Mr. Adams for Big D, indicates the paucity of information being devulged by DP&L employees.

Q Do you recall about when it was that Mr. Adams called?
A Roughly 10:00 in the morning.
Q And did he tell you that he was at the Big D auto lot premises?
A He identified himself as being with the Big D.
  *       *       *       *       *
Q What did he ask you?
A I can't remember exactly, but he asked if we were going to release any more water, I believe is the general question.

Q All right. What did you say?
A In general I told him that we wouldn't release any more water than was absolutely necessary. All that we released was the water that came into the lake and we passed it through the lake.
Q Well, did you lead him to believe that you would be releasing more water or you would not be?
A I did not lead him to believe any condition.
Q All right. Did you refer him to Mr. Wheeler? [The Lake Control Engineer]
A No.
Q Did you tell him that you could not give him the information that he wanted?
A I told him or I gave him factual information of the conditions that existed at that time.
Q Did you give him any information of what you expected the factual conditions to be an hour later or two hours later?
A No.
  *       *       *       *       *
Q At the time that you talked with Mr. Adams, you, of course, knew that the level of the lake was rising and that in all likelihood DP&L would be discharging a great volume of additional water, did you not?
A Yes.
Q But you did not tell him that?
A No, he didn't ask.
Q But he did want to know what your intentions were with regard to discharging water, didn't he?
A I suppose so.

### Contributory Negligence

Although the case is to be retried, the question of contributory negligence will undoubtedly arise again and we feel it necessary to address this problem without implying any opinion as to the sufficiency of the evidence. In fact we expressly disclaim any purpose to assess the sufficiency of the evidence.

■ The District Court denied a judgment despite the finding of negligence of DP&L since the jury found "Big D Auction Company knew that its premises were subject to flooding [and] they failed to exercise ordinary care in storing said motor vehicles," on the occasion in question. (See special interrogatories 9 through 12). The bailment relationship between Big D and Ford allowed the Court to impute[23] the contributory negligence of Big D to Ford thereby barring Ford from any relief based on the theory of general negligence (not strict liability).

■ At the time of the 1969 flood, Texas still adhered to the time-honored doctrine of contributory negligence.[24] Any degree of negligence on the part of the plaintiff (Ford) would operate as an absolute bar to recovery.[25] E. g., Burgamy v. Lawrence, 480 S.W.2d 38 (Tex. Civ.App.1972, no writ) ; Bock Construction Co. v. Dallas Light & Power Co., 415 S.W.2d 227 (Tex.Civ.App.1967, no writ).

Since the case is to be retried we make special mention of contributory negligence because of the peculiar operational facts which make, or might make, traditional submission of contributory negligence inadequate. A simple finding of contributory negligence might impose an unreasonable penalty on the plaintiff, Ford. On the other hand to ignore it altogether might impose an unreasoned burden on the tortfeasor, DP&L. For example, on a finding that Ford was negligent in having the cars on the lot on May 7 and a parallel finding that DP&L was negligent in failing to give warning of its intended actions and their likely consequences, DP&L ought not to be exonerated of those damages which, despite Ford's negligence in storage, would have been avoided had the warnings been given. Conversely, DP&L ought not to have to reimburse Ford for such part of the damage as was not avoidable after warning and which would therefore be operationally attributable to the underlying negligence of Ford in using Big D as a storage lot.[26]

■ This brings into play the doctrine of avoidable consequences. Under the doctrine of avoidable consequences a plaintiff with an otherwise

**23.** The Texas law is clear that the negligence of the bailee is imputed to the bailor. See, e. g., Rose v. Baker, 138 Tex. 554, 160 S. W.2d 515 (1942) ; Socony Mobil Oil Co. v. Slater, 412 S.W.2d 349 (Tex.Civ.App.1967, writ ref'd n. r. e.) ; Weir v. Petty, 355 S. W.2d 192 (Tex.Civ.App.1962, writ ref'd) ; Langford Motor Co. v. McClung Construction Co., 46 S.W.2d 388 (Tex.Civ.App.1932, writ ref'd).

**24.** In 1973 the Texas legislature enacted a form of modified comparative negligence which provides that contributory negligence will no longer be a complete bar to recovery to persons whose negligence is not greater than the negligence of the person against whom they seek to recover damages. Art. 2212a § 1, Vernon's Ann.Tex.Civ.St. Acts 1973, 63rd Leg., p. 41, Ch. 28, §§ 1, 2.

**25.** We do not forecast whether contributory negligence for this 1969 event would be a bar to recovery on findings of unreasonable intentional invasion with resulting injury on the analogy of the Texas rule as to strict liability. See, Shamrock Fuel & Oil Sales Co., Inc. v. Tunks, 416 S.W.2d 779 (Tex. 1967) ; McKisson v. Sales Affiliates, Inc., 416 S.W.2d 787 (Tex.1967).

**26.** To make it more tangible, assume Big D's request for advice and DP&L's refusal at 8:30 a. m. and inability to move out any more cars after 2:30 p. m., DP&L should bear the loss of cars that would have been moved out in that period. Ford would bear loss of those unmovable after 2:30 p. m.

valid right of action, may be denied recovery for so much of the losses as are shown to have resulted from failure on his part to use reasonable efforts to avoid or prevent the losses. Conversely, a tortfeasor may be responsible for those consequences which its actions could have avoided notwithstanding earlier contributory negligence of the plaintiff. There are distinct differences between contributory negligence and avoidable consequences which control the application of each.

"The contrast is most vivid in contemplating a traditional common law situation. 'If the plaintiff by negligent action or inaction *before* the defendant's wrong doing has been completed has contributed to cause actual invasion of plaintiff's person or property, the plaintiff is wholly barred of any relief. The doctrine of avoidable consequences comes into play at a later stage. Where the defendant has already committed an actionable wrong, whether tort or breach of contract, then this doctrine limits the plaintiff's recovery by disallowing only those items of damages which could reasonably have been averted * * * contributory negligence is to be asserted as a complete defense, whereas the doctrine of avoidable consequences is not considered a defense at all, but merely a rule of damages by which certain particular items of loss may be excluded from consideration * * *' [emphasis the author's], McCormick on Damages, West Publishing Company, 1935, Chapter 5, Avoidable Consequences, pages 127 et seq.; see also 61 Harvard Law Review (1947), 113, 131–134, Developments in Damages."

Southport Transit Company v. Avondale Marine Ways, 5 Cir., 1956, 234 F.2d 947, 952, 1956 A.M.C. 1498. The doctrine of avoidable consequences is a recognition of the law's general policy that parties minimize damages through reasonable diligence. The doctrine merely goes to a reduction or allowance in damages to be awarded.[27] See Alcoa Steamship Company v. Charles Ferran & Company, 5 Cir., 1967, 383 F.2d 46, 54. W. Prosser, Law of Torts 2d ed. § 51, p. 287.

██ The Court should therefore submit to the jury questions upon which the jury can resolve issues of possible negligence on the part of all parties involved with appropriate subelements so that the Court can then apply the principles of avoidable consequences and contributory negligence to the jury's findings.

For the reasons set forth in this opinion, we reverse and remand the decision of the District Court in order that a new trial may be held consistent with our directions.

Reversed and remanded.

27. This federal court is not hesitant to apply the doctrine of avoidable consequences since it has been applied as a fundamental rule by Texas courts for losses arising from actions in tort and breach of contract where the injured plaintiff has been required to exercise reasonable care to minimize damages and avoid the consequences of the injury. E. g., Hickman v. Cooper, 210 S.W.2d 858 (Tex.Civ.App.1948, writ ref'd n. r. e.) ; Morgan v. Young, 203 S.W.2d 837 (Tex.Civ.App.1947, writ ref'd n. r. e.) ; Smith v. International Printing P. & A. Union, 190 S.W.2d 769 (Tex.Civ.App.1945) rev'd on other grounds, 1946, 145 Tex. 399, 189 S.W.2d 729; Reavis v. Taylor, 162 S.W.2d 1030 (Tex.Civ.App. 1942, writ ref'd w. o. m.) ; Walker v. Salt Flat Water Co., 64 S.W.2d 1015 (Tex.Civ. App.1933) rev'd on other grounds, 1936, 128 Tex. 140, 96 S.W.2d 231; Gulf Pipe Line Co. v. Watson, 8 S.W.2d 957 (Tex.Civ.App. 1928, no writ).