BERKLEY MACHINE WORKS & FOUNDRY COMPANY, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Berkley Machine Works & Foundry Co. v. Commissioner
Docket No. 485-76, 3683-77, 22859-80
United States Tax Court
T.C. Memo 1983-477; 1983 Tax Ct. Memo LEXIS 306; 46 T.C.M. (CCH) 1060; T.C.M. (RIA) 83477; August 15, 1983. *306 1. Petitioner owned and maintained three buildings on Ocracoke Island, North Carolina, which it used, as hunting and fishing lodges, for the entertainment of employees of its major customers and a few of its smaller customers during 1968 through 1978. Petitioner's officers would decide which customer-companies were to be invited on a particular hunting and/or fishing trip to Ocracoke, and the sales representatives for the customers would phone contacts of theirs in a position of authority in the companies, who would in turn designate the employees who were to go. Held, deductions for petitioner's expenses with respect to its entertainment activity and facility are disallowed by section 274(a). Held further, petitioner's expenditures for meals and beverages do not fall within the exception of section 274(a) contained in section 274(e)(1). 2. Held, petitioner was availed of during the years 1973 and 1974 for the purpose of avoiding the income tax with respect to its shareholders; the accumulated earnings tax is, therefore, imposed by section 531 on petitioner's accumulated taxable income for each of such years. Heldfurther, petitioner's reasonable business needs exceeded its *307 net liquid assets as of the end of each of the years 1975 and 1976; the accumulated earnings credit provided for in section 535(c), therefore, causes petitioner's accumulated taxable income to be equal to zero in 1975 and 1976 and petitioner is not liable for the tax imposed by section 531 for those years. Ellsworth T. Simpson, for the petitioner. John C. McDougal, for the respondent. IRWIN
MEMORANDUM FINDINGS OF FACT AND OPINION IRWIN, Judge: In these consolidated cases respondent determined deficiencies in petitioner's Federal income taxes as follows: Docket No.
Year
Deficiency
485-76
1968
$49,461.44
1969
39,329.80
1970
41,041.53
1971
35,331.00
1972
54,292.00
3683-77
1973
154,524.00
1974
295,086.00
1975
248,294.00
22859-80
1976
244,469.00
1977
57,322.00
1978
73,896.00
By an amendment to his answer, respondent claimed an increase of $14,623.50 in the deficiency in docket no. 3683-77 for the taxable year 1974. [1]
Concessions having *308 been made by both parties, the issues remaining for our decision are: (1) Whether petitioner is entitled to deduct expenses incurred in connection with entertainment facilities maintained and activities conducted at Ocracoke, North Carolina, during each of the taxable years in issue; and (2) Whether for the taxable years 1973, 1974, 1975, and 1976, petitioner was availed of for the purpose of avoiding the income tax with respect to its shareholders by permitting earnings and profits to accumulate instead of being divided or distributed and is, therefore, liable for the accumulated earnings tax imposed by section 531. [2] FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and the exhibits attached thereto are incorporated herein by this reference. The petitioner, Berkley Machine Works & Foundry Company, Inc., was incorporated in 1914 under the laws of the Commonwealth of Virginia. Throughout the years in issue, *309 petitioner maintained its principal office in Norfolk, Virginia, where its plant is also located. Petitioner filed its Federal income tax returns for the years 1968 to 1971 with the Mid-Atlantic Service Center in Philadelphia, Pennsylvania. For each of the years 1972 through 1978, inclusive, petitioner filed its Federal income tax returns with the Internal Revenue Service Center in Memphis, Tennessee. In reporting its taxable income for each of the years 1968 to 1978, inclusive, petitioner utilized the accrual method of accounting. Until his death on September 27, 1977, at 84 years of age, Samuel G. Jones, Sr., was petitioner's president and owned 83 percent of petitioner's capital stock. From 1963 through October 1, 1977, Samuel G. Jones, Jr., was petitioner's vice-president and owned the remaining 17 percent of petitioner's capital stock. Since October 1, 1977, Samuel G. Jones, Jr., has been petitioner's president. 1. Entertainment Expenditures
Petitioner's business involved the operation of a foundry for iron, steel, brass, and aluminum, including a pattern shop and a machine shop, and the manufacture of metal castings and forgings. Berkley manufactured both parts used *310 by other companies in their production of a finished product and repair parts for equipment used by other companies in their production process. Patterns for parts that petitioner manufactured were provided either by existing plans and specifications or by using old parts as a sample. Petitioner's ability to acquire a particular job of manufacturing equipment repair parts was often dependent upon its ability to produce them more quickly and less expensively than the original equipment manufacturer. Because of the nature of petitioner's business, media advertising was of limited usefulness. The company's policy for promoting sales was that of developing and maintaining personal contact with the appropriate personnel of its customers--individuals often in various departments of the same company. Berkley's principal sales efforts were directed toward a small number of major customers, including Albemarle Paper Company, American Oil Company, Bowater Carolina Corporation, Bowen-McLaughlin-York Company, Continental Can Company, Drill Carrier Corporation, Federal Paper Board Company, Penn Central Railway, Texas Gulf Corp., Union Camp Corporation, Westvaco Company, and Weyerhaeuser Company. *311 The number of contracts entered into between petitioner and its major customers during the years 1968 to 1978 total 4,732. Petitioner's other customers (approximately 150) only accounted for roughly 15 to 25 percent of petitioner's total sales. Petitioner's contact with its major customers, the frequency of which varied from as often as three or four times a day to as seldom as once a week, was maintained primarily through two sales representatives. E. M. Weber concentrated his activities in the area around York, Pennsylvania, where the Pennsylvania Railroad and Bowen-McLaughlin-York were located. From the Norfolk office, C. M. Halsey directed the sales effort toward local customers and customers located in other southeastern states. However, petitioner's largest customer, Drill Carrier Corporation, was serviced by Samuel G. Jones, Jr., and F. P. Huber, the foundry superintendent. [3]
When an employee of one of petitioner's customers wanted a part manufactured, he consulted with one of petitioner's *312 sales representatives. The sales representative then reviewed drawings of the part prepared by the customer's employee to determine if petitioner could make the part to the mututal advantage of the customer and petitioner, prepared an estimate or "quote" of the price for the part, and "follow[ed] up to get an order." If an order was received, the sales representative was responsible for making sure that the job was completed on time. Petitioner's customers could get in touch with petitioner's sales representatives at any time. One of the means by which petitioner cemented its relationships with its customers was by use of an entertainment facility owned and maintained by it on Ocracoke Island. Ocracoke is an isolated island off the Atlantic Coast of North Carolina, just south of Hatteras, consisting of a small cluster of homes at one end and a succession of sand dunes and marshes leading to the other end. Petitioner's Ocracoke facility consisted of three buildings of wood-frame construction, known as "Berkley Castle," "Berkley Manor," and "Berkley Ranch House," the exteriors of which were covered with fir shingles. Each building was designed as a home, with a living room, a dining *313 room, and several bedrooms. The interiors were nicely furnished to reflect the taste of Jones, Sr. On the second floor of Berkley Castle, the largest of the three buildings, was a conference room containing a drafting board, a large table, and a number of chairs. Berkley Castle was used as a fishing lodge. Berkley Manor was used infrequently for overflow purposes, and Berkley Ranch House was used rarely, if at all, for that purpose. During 1968 through 1978, employees from all of petitioner's major customers and from a few of its smaller customers were invited by petitioner's officers and sales representatives to visit the Ocracoke facility for hunting and/or fishing trips. Berkley's officers would decide which customers would be invited for a particular weekend, and the sales representative for that customer would phone a contact of his in a position of authority in that company, who would in turn designate the employees who were to go. On occasion, petitioner's business associates would be accompanied by members of their families, or other guests having no direct business relationship with petitioner. The number of guests present at a single time varied between about six and *314 30, the general number approaching the arithmetical mean of these extremes. Guests typically received, as mementos of their Ocracoke visit, gifts distributed by petitioner such as hunting and fishing knives, model ducks to be used as doorstops, cookbooks or other books, and neckties with a Berkley label. Petitioner's Ocracoke facility was used throughout the year, but primarily on weekends from late spring through early fall. However, guests were not invited each and every week, even during this period. A typical fishing trip to Ocracoke began on Thursday afternoon or Friday morning. After breakfast on Friday, the fishermen split into teams of four, five, or six and fished until lunchtime from boats chartered by petitioner from various individuals who were engaged in the business of taking out fishing parties off the coast of North Carolina. The fishermen returned to Berkley's facility for lunch and then resumed fishing for the remainder of the afternoon. Saturday's activities duplicated those of Friday. Guests generally left the island after breakfast on Sunday. The Ocracoke setting established a congenial and relaxing atmospohere in which petitioner's sales representatives *315 pursued petitioner's business interests, i.e., promoting sales. Business discussions often centered around specific jobs that Berkley was in the process of performing for its customer-guests. At other times, determinations were made whether Berkley could perform specific jobs which the customer-guests needed done.On occasion, petitioner's guests would initiate discussions about problems that arose only a few days prior to their trip to Ocracoke, after the visit had been planned. The conference room in Berkley Castle was used when examination of plans and specifications was pertinent. Discussions of anticipated business needs and job scheduling were conducted in even less formal surroundings, e.g., on the fishing boats, during meals, and while relaxing after dinner. In composing the parties to be invited to Ocracoke on a particular occasion, Berkley's representatives sometimes included employees from several different customer-companies. By so mixing its guests, petitioner was able to make certain customers aware of the work that it was performing for others--the underlying purpose of which was to inform each company of the different and additional types of work that petitioner *316 could do for it. Business guests visiting Ocracoke believed the trips there to be meaningful and beneficial to both their employers and to Berkley because of the actual substantive matters discussed and resolved and also because of the information they received about various other functions that Berkley could perform for them. The business discussions which took place at Ocracoke during 1968 through 1978 were substantially the same in nature (although not identical as to the specific business discussed on particular occasions) as those which took place during the years 1963 through 1967. Petitioner's former president and major stockholder, Samuel G. Jones, Sr., owned and maintained a vacation home on Ocracoke Island.The home was not adjacent to petitioner's recreational facilities. Although it was usual for Jones, Sr., to attend the Berkley facility while guests were being entertained, he did not participate in the hunting or fishing, and he returned to his personal residence in the evenings. During the years 1968 - 1978, inclusive, petitioner's Ocracoke facilities were never used for the personal benefit of its officers, nor were these facilities ever used by members of their *317 families. In fact, the Ocracoke facilities were used exclusively in connection with the fishing trips for customers. When the facilities were not used in connection with the fishing trips, they were not used at all. The parties have stipulated that petitioner's Ocracoke Island facilities were "used primarily for the furtherance of petitioner's business." Mr. Weber's testimony indicated that he sometimes prepared agendas before he went to Ocracoke Island. However, he did not relate his testimony to any particular trip or year. [4] Mr. Halsey prepared no agendas outlining business matters he wanted to discuss before he went on trips to Ocracoke Island.No other evidence in the record indicates that agendas were prepared before any of the trips to Ocracoke Island during the years in question. Petitioner employed a caretaker to oversee the operation of its Ocracoke facility. The caretaker was responsible for preparation of the *318 facility for use by petitioner's representatives and guests which, when appropriate, included chartering the required number of fishing boats. Other islanders were hired to do cleaning, laundering, and the cooking and serving of meals at the facility. The caretaker collected bills for the various expenses incurred on the island, e.g., boat charter fees, restaurant meals, and groceries, and forwarded them to petitioner's Norfolk office for payment. For each of the years 1968 through 1978, petitioner claimed deductions for depreciation of buildings, furniture and fixtures, boats, a marine railway, and an airplane, which were used as parts of petitioner's entertainment facility on Ocracoke Island, in the following total amounts. Year
Amount
1968
$46,387.35
1969
42,407.69
1970
39,639.20
1971
35,480.33
1972
44,633.89
1973
47,402.00
1974
38,303.00
1975
31,184.00
1976
57,332.00
1977
54,928.00
1978
34,770.00 Respondent disallowed the amounts listed above in their entirety pursuant to section 274. The cost bases assigned by petitioner to the assets on which depreciation was claimed are not in dispute. Respondent determined, and petitioner has conceded, that some assets depreciated under the heading "Berkley *319 Manor Furniture and Fixtures" constitute antiques or artworks having indeterminate useful lives and salvage values greater than their costs. Petitioner has agreed that respondent properly disallowed deductions claimed for depreciation of the items determined to constitute antiques or artworks, regardless of the resolution of the section 274 issue. Neither the useful lives nor salvage values assigned by petitioner to the remaining assets on which depreciation was claimed are in dispute. Except for reports of Ocracoke trips prior to 1969, petitioner's books and records were kept in the regular course of its business and conformed to generally accepted accounting principles, and the entries reflected in petitioner's books and records were made contemporaneously with the events recorded therein. The parties have stipulated that the amounts, times, and place of the expenses incurred in entertaining at Ocracoke have been established, pursuant to section 274(d) and the regulations thereunder.Whether the remaining substantiation requirements provided by section 274(d) and the regulations thereunder--concerning the business relationshiip between the taxpayer and its guests and the business *320 purpose of the entertainment--have been satisfied is in dispute. Reports concerning each of the trips to Ocracoke during the years 1969 through 1978 were prepared by petitioner's sales representatives contemporaneously with the trips to which the reports relate. No reports were prepared contemporaneously with the trips to Ocracoke during 1968. For the years 1969 through 1978, petitioner has somewhat over 130 trip reports. Approximately one-third of the trip reports do not indicate the job titles of the individuals entertained. Those titles which are mentioned are not sufficient to establish that all of the entertainees had dealings with petitioner. The trip reports which show job titles indicate that petitioner permitted its customers to include individuals in the groups entertained at Ocracoke who, from their designations, clearly had no business dealings with petitioner, as set forth in Table I on pages 14-17. Only a few of the individuals entertained were named in the reports as having specific discussions with petitioner's personnel. Many of the reports did not identify any guests by name as having business discussions with petitioner's personnel. According to the reports, *321 it was not unusual for employees of petitioner's customers to be accompanied by their wives and children on the Ocracoke trips. The reports indicate that wives and children were present on all the trips for employees of companies serviced by Mr. Weber. At trial petitioner introduced into evidence a booklet prepared for it reflecting the name and job title of each individual entertained at Ocracoke during 1968 through 1978 and the date(s) of each individual's visit(s) to Ocracoke. The entries in the booklet, which is arranged by the companies that employed the individual guests, were not made at or near the time of the particular expenditures related to each guest. TABLE I
Designation
Customer-Company
Individual
Dates Attended
Retired
Weyerhaeuser Co.
Holbrook
October 13-15, 1972
June 28-30, 1974
May 30 - June 1, 1975
Retired
Union Camp Corp.
Duck
October 11-13, 1974
October 8-10, 1976
Retired
Union Camp Corp.
Scott
June 6-8, 1975
September 17-19, 1976
Retired
American Oil Co.
Scott
September 8-10, 1978
October 12-15, 1978
Retired
Union Camp Corp.
Eubanks
June 10-12, 1977
Retired
Continental
Mitchell
July 15-17, 1977
Can Co.
Retired
Union Camp Corp.
Brenner
July 22-24, 1977
June 16-18, 1978
Retired
Federal Paper
Jones
July 7-9, 1978
Board Co.
Data Processing
Albemarle Paper
Oliver
July 27-29, 1973
Co.
I.B.M. (which
Elks
June 2-4, 1972
is not
a customer of
May 25-27, 1973
petitioner)
Chemist
Continental Can
Boone
August 11-13, 1972
Co.
Chemist
Continental Can
Erhspomer
October 25-27, 1974
Co.
July 11-13, 1975
September 12-14, 1975
July 15-17, 1977
Credit Manager
Federal Paper
Hunley
October 8-10, 1976
Board Co.
Communications
Union Camp Corp.
March
May 25-27, 1973
Communications
Union Camp Corp.
Pearson
June 10-12, 1977
(in 1977); Clerk
July 21-23, 1978
and Router (in
1978)
Merchandising
Weyerhaeuser Co.
Tilly
October 13-15, 1972
Superintendent
Salesman
American Oil Co.
Scott
June 8-10, 1973
Sales Manager
Union Camp Corp.
Stevens
September 17-19, 1976
Salesman
Union Camp Corp.
Gay
September 17-19, 1976
Sales
Continental Can
Simon
June 3-5, 1977
Co.
Supply Sales
Weyerhaeuser Co.
Keener
July 29-31, 1977
Instrument
Weyerhaeuser Co.
Norris
June 18-20, 1971
Superintendent
October 13-15, 1972
June 8-10, 1973
September 27-29, 1974
May 30 - June 1, 1975
Electrical and
Continental Can
Dansby
June 3-5, 1977
Instrument
Co.
Superintendent
Instrument
Continental Can
Harrison
July 15-17, 1977
Foreman
Co.
Accounting
Union Camp Corp.
Copeland
June 2-4, 1972
September 21-23, 1973
Comptroller
Albemarle Paper
Farley
July 14-16, 1972
Co.
Accountant
Hoerner Waldorf
Farley
June 17-19, 1977
Corp.
Accounting
Weyerhaeuser Co.
Lamb
June 8-10, 1973
Accounting
Weyerhaeuser Co.
Jasper
June 8-10, 1973
Comptroller
Albemarle Paper
Henderson
July 12-14, 1974
Co.
Comptroller
Continental Can
Dodson
July 11-13, 1975
Co.
June 25-27, 1976
July 15-17, 1977
July 14-16, 1978
Auditor
Continental Can
Goodrich
September 12-14, 1975
Co.
Accountant
Union Camp Corp.
Earley
September 17-19, 1976
Plant Controller
Continental Can
Ball
June 3-5, 1977
Co.
Accounting
Hoerner Waldorf
Watkins
September 9-11, 1977
Corp.
Personnel
Albemarle Paper
Burgwyn
July 14-16, 1972
Co.
Director, Salaried
Personnel
Personnel Director
Albemarle Paper
Morris
July 14-16, 1972
Co.
Hourly Personnel
Personnel
Hoerner Waldorf
Morgan
May 21-23, 1976
Corp.
Personnel Manager
Amoco Oil Co.
Smith
July 29-31, 1977
July 7-9, 1978
Personnel Manager
Hoerner Waldorf
Fields
June 2-4, 1978
Corp.
Chief Security
Penn Central
Wolfe
June 26 - July 1, 1971
Railway
Officer
June 16-23, 1972
June 22-29, 1973
Clerk in Planning
Union Camp Corp.
Barrett
June 6-8, 1975
Clerk
Continental Can
Daniels
June 22-25, 1978
Co.
*322 The majority of the trip reports, aside from listing a few machines or parts which were discussed, include little or no information concerning the substance of the conversations about those parts or machines, that is, whether petitioner previously manufactured or repaired the parts or machines for the customer involved, whether petitioner was manufacturing or repairing the parts or machines for the customer at or near the time of the trip, whether petitioner desired to manufacture such parts or machines for the customer, or whether the parts or machines were being discussed in general and not in terms of petitioner's work. Those reports which disclose the substance of the conversations concerning various parts or machines indicate topics such as repairs or parts which customers advised petitioner they were "going to order", handling of orders already placed, the progress of orders already placed, and petitioner's need for additional lead time on certain orders. Drawings or plans are mentioned in only 14 of the over 130 trip reports. [5] *324 Ten of those 14 reports concern trips for employees of petitioner's largest customer, Drill Carrier Corporation or Gardner-Denver Corporation. See *323 page 6, supra. Petitioner received orders on only 3 of those 10 trips. [6] The reports for those 3 trips only indicates that drawings were reviewed and orders received, not whether negotiations or discussions to obtain the orders occurred at Ocracoke. The report for only one of the above-mentioned 10 trips with Drill Carrier Corporation or Gardner-Denver Corporation indicates that petitioner's sales representatives took a quotation and drawings along with them. The weather on that trip (June 9-11, 1978) is described by the report as having been "inclement with high winds for the two fishing days." On the remaining 9 occasions, the reports simply indicate that petitioner's sales representative went over the plans or drawings with employees of Drill Carrier Corporation or Gardner-Denver Corporation to eliminate problems with particular parts, to become acquainted with a pattern change, to advice employees of Gardner-Denver Corporation whether they should make any changes before making patterns for parts they had fabricated, or to submit quotes at a later date. Three of the 14 trip reports which mention drawings or plans report on trips for employees of Penn Central Railway and Bowen-McLaughlin-York, which were 6 or 7 days long. A group meeting was conducted on one evening during each of those trips. See n.4, supra. At the meeting on each of the three trips, an employee of Penn Central Railway gave Mr. Weber a drawing. The reports do not indicate that Mr. Weber engaged in any negotiations or discussions to obtain orders for the parts to which those drawings relate at such meetings. Instead, the reports indicate that (1) in 1971, Mr. Weber was given a drawing to determine whether petitioner was interested in quoting on certain parts that could no longer be obtained by Penn Central Railway from another one of its suppliers, (2) in 1972, Mr. Weber was "given a drawing," and (3) in 1973, Mr. Weber was given a drawing for a certain part and asked for a price *325 and delivery quote, which he informed the employee of Penn Central Railway he would try to provide in the next few weeks since the item was "quite involved." The final report which mentions drawings is a report for a fishing trip for employees of Union Camp Co. and TexasGulf Corp. on October 2-4, 1970. This report also does not indicate whether petitioner's sales representative engaged in any negotiations or discussions during the fishing trip to obtain orders of the parts to which the drawings relate. Insofar as the drawings are concerned, the report indicates only that the customers brought the drawings along. The trip reports reflect only 5 occasions on which petitioner received orders during the Ocracoke trips. All those orders were received from Drill Carrier or Gardner-Denever, petitioner's largest customer. On at least one of the trips (October 1-3, 1971), an employee of Drill Carrier brought the order with him. Whether petitioner's sales representatives engaged in negotiations or discussions at Ocracoke to secure the other four orders is not indicated by the pertinent trip reports (May 7-10, 1970; June 19-21, 1970; September 24-27, 1970; and June 4-6, 1971). Only 8 of *326 the over 130 reports mention formal or group meetings at which business was discussed. The majority of those are reports of the 6 or 7-day trips for employees of companies serviced by Mr. Weber, during which a meeting was held on one evening. In addition, 34 other reports mention the showing of picture slides of petitioner's plant and/or operations.[7]
Most of petitioner's trip reports do not state in what context discussions regarding business arose, aside from the formal or group meetings. Some of the reports indicate that business was discussed at "opportune times" or "whenever there was a suitable opportunity." A number of the trip reports contain references to the goodwill benefits petitioner expected to derive from the Ocracoke entertainment. The total amounts, excluding depreciation, expended by petitioner in connection with the operation of its entertainment facility at Ocracoke and disallowed by respondent are as follows: 1968
1969
1970
1971
1972
1973
SUPPLIES
USED AT
OCRACOKE
$2076.00
$2269.20
$13453.35
$1663.62
$12427.76
$2647.00
SALARIES
AND PAYROLL
TAXES
27890.92
18091.20
29924.88
27083.48
32510.49
28479.00
INSURANCE
951.00
893.00
893.00
922.00
1292.00
REPAIRS
5246.53
4823.51
2395.00
617.61
2761.90
UTILITIES
2457.10
979.23
1503.07
1699.26
2169.48
TRAVEL AND
PROMOTION
8667.01
8943.38
5442.22
8537.79
17568.00
AIRPLANE
EXPENSE
4176.74
12017.90
8834.00
PILOT'S
SALARY AND
TAXES
396.08
1462.92
959.00
TOTALS
$47288.56
$35999.52
$4816.930
$42001.01
$73180.24
$58487.00
*327 1974
1975
1976
1977
1978
SUPPLIES USED AT
OCRACOKE
$5993.00
$22151.00
$6091.00
$12131.00
$12896.00
SALARIES AND PAYROLL
TAXES
28068.00
23864.00
23670.00
27727.00
26400.00
INSURANCE
REPAIRS
UTILITIES
TRAVEL AND PROMOTION
11897.00
14235.00
10744.00
15306.00
12625.00
AIRPLANE EXPENSE
42673.00
18671.00
10157.00
14073.00
11707.00
PILOT'S SALARY AND
TAXES
743.00
1278.00
853.00
1238.00
978.00
TOTALS
$89374.00
$80199.00
$51515.00
$70475.00
$64606.00
2. Accumulated Earnings Tax
Plant and Equipment. Barkley's minutes of a special meeting of its board of directors held on March 8, 1972, read, in part, as follows: The board of directors was presented a report entitled "Plant Survey - 1971" concerning the question of machine tool equipment and plant improvement. We find after the survey of equipment by Mr. Weber and Mr. Landis that we need $2,246,450 to replace old, obsolete equipment. This large amount necessary for equipment is on account of the fact that we have not been financially able to make replacements from year to year that should have been made. We find now that competition is more pressing and we will have to put more effort toward replacement of obsolete equipment than we have in the past. To bear this out, we are attaching *328 hereto report entitled "Plant Equipment Survey" made November 17, 1971. In addition to the above, at least $300,000 is neeced to build a new building suitable to take care of heavier work than we are able to take care of now, and equipment for this building would cost an estimated half million dollars. In accordance, we feel it appropriate to designate one million dollars to be applied from our Retained Earnings and set aside in a special account as a Reserve for Major Capital Expenditures. We shall continue to set aside funds in our Machinery Reserve Account with the United Virginia Bank and when sufficient funds are in the account we shall continue a program of acquisition of equipment and start plans for a new building. The report entitled "Plant Survey - 1971" recommended that any combination of the following seven proposals contained therein be undertaken: 1. Dispose of the oldest equipment, marked "S" on a schedule of equipment, and apply any money derived from their disposal toward upgrading buildings or machinery; 2. Fix the old foundry and relocate the blacksmith and his equipment in that building at an estimated cost of $32,900; 3. Extend the then-existing heavy machine *329 shop to the area vacated by the blacksmith (assuming that proposal number 2 is undertaken) which would entail renovating and properly equipping the vacated area at an estimated cost of $213,100; 4. Rearrange the smaller machine tools at an estimated cost of between $2,000 and $3,000; 5. As an alternative to proposal number 3, find another place for the weld shop and clearning department at an estimated cost of $273,400; 6. Move all saws to a single location where all raw materials could be received and processed at an estimated cost of $2,500; and 7. Purchase a "Clarklift" fork truck to use for transportation of materials within petitioner's building at an estimated cost of $8,000 for a truck with a capacity of 5,000 pounds or $9,000 for a truck with a capacity of 6,000 pounds. The survey also indicated the condition of each of petitioner's machines: excellent, very good, good, fair, poor, or "S." It recommended that the machines which were in excellent or very good condition be retained and maintained, that those which were in poor condition be sold and replaced, and that those in "S" condition be sold or scrapped to provide petitioner with additional floor space. The survey *330 did not recommend the construction of a new building as one of its alternatives. In the mid-sixties, petitioner began acquiring parcels of land adjoining its then-existing plant. The table below sets forth the dates of acquisition and the costs to petitioner of such parcels. Parcel
Sale Date
Price
700 Pine Street
August 1966
$1,500
702 Pine Street
June 1966
500
710-712 Pine Street
August 1974
2,000
Demolition
795
704 Pine Street
May 1975
2,015
706 Pine Street
May 1975
2,015
716 Pine Street
September 1975
6,402
Demolition
1,400
708 Pine Street
October 1977
16,660
The parcels listed above were improved by occupied dwellings. As the various dwellings were vacated and the parcels were placed on the market, petitioner bought them. The parcel designated as 708 Pine Street cost more than the other parcels because it was in the middle of the block and its sellere apparently held out for the highest price he could get for it. On August 10, 1977, petitioner entered into an agreement with Acorn Construction, Ltd. (hereinafter Acorn), whereby Acorn was to construct a new plant facility for petitioner.The total cost of construction was estimated to be $380,200. On August 10, 1977, petitioner made a downpayment of $100,000 *331 to Acorn. The minutes of a special meeting of petitioner's board of directors held on October 17, 1977, read, in pertinent part, as follows: After a full discussion of plant expansion plans for new building on Pine Street at an approximate value of $350,000, and the $650,000 approximate cost of new equipment for the building, it was duly moved and seconded to proceed with the project. * * * The Board approved the purchase of a lot at the rear of the plant, known as 708 Pine Street, for $16,600. Acorn constructed the new plant facility for petitioner. Petitioner's new plant facility is located on the parcels mentioned earlier, which are adjacent to its old plant. Upon completion of the new facility, petitioner owed Acorn $351,166. Petitioner paid that amount to Acorn in 1979. During the taxable year 1978, petitioner acquired new equipment for $500,641. From January 1, 1968, through December 31, 1978, petitioner's cash on hand increased from $103,900.40 to $2,054,306, a net increase of $1,950,405.60. During this same period, petitioner's buildings and other fixed depreciable assets increased from $1,162,259.44 to $2,651,787, a net increase of $1,489,527.56. On its income tax *332 returns for 1968 through 1978, petitioner claimed deductions for depreciation totaling $1,457,258. During 1978, the year in which petitioner paid most of the costs for its plant expansion and equipment acquisition, petitioner's net liquid assets decreased by only $61,215. Proposed Tax Deficiencies. Revenue Agent Ernestine McGinty discussed the possibility of asserting the accumulated earnings tax with petitioner's representatives prior to the end of 1973. However, because contingent liabilities for federal income taxes for 1963 through 1972 generated a credit large enough to offset all of petitioner's accumulated taxable income, Revenue Agent McGinty did not recommend the issue in her revenue agent's report dated December 3, 1973, nor was it raised in the statutory notice of deficiencies dated December 12, 1975. Revenue Agent Lucille Stephenson recommended imposition of the accumulated earnings tax for 1973, 1974, and 1975 in her revenue agent's report dated July 16, 1976. The Internal Revenue Service notified petitioner that it proposed to impose the tax in a notice mailed to petitioner pursuant to section 534(b) on January 11, 1977. The formal determination that petitioner *333 was liable for the accumulated earnings tax was made in the statutory notice of deficiencies mailed to petitioner on March 14, 1977. Petitioner was first advised that its income tax returns for 1976 through 1978 would be examined on November 20, 1979. Petitioner's Financial Data. At the end of the taxable years 1973 through 1976, petitioner's net liquid assets were as follows: 1973
1974
1975
1976
Current Assets: Cash
$ 764,149
$1,391,207
$1,182,172
$1,652,199
Accounts Receivable
310,546
453,152
515,746
543,975
Inventories
66,645
91,855
94,348
90,315
Other Current Assets
16,570
2,810
21,159
83,471
Total Current Assets
$1,157,910
$1,939,024
$1,813,425
$2,369,960
Current Liabilities: Accounts Payable
60,582
84,719
82,749
82,690
Income Tax Payable
90,176
Total Current
Liabilities
$ 60,582
$ 174,895
$ 82,749
$ 82,690
Net Liquid Assets
$1,097,328
$1,764,129
$1,730,676
$2,287,270 As of the close of the taxable years 1973 through 1976, petitioner's prior earnings available for reasonable needs of its business were as follows: 1973
1974
1975
1976
Net Liquid Assets
at End of Year
$1,097,328
$1,764,129
$1,730,676
$2,287,270
Current Earnings
and Profits
244,813
544,764
521,272
475,666
Prior Earnings
Available for
Reasonable
Needs
$ 852,515
$1,219,365
$1,209,404
$1,811,604
As *334 of the end of each of the taxable years 1973 through 1976, petitioner reasonably anticipated the need to retain earnings (1) for working capital and (2) to discharge contingent liabilities for state income tax and interest in the following amounts: 1973
1974
1975
1976
Working Capital
$255,709
$266,720
$452,637
$445,623
State income tax
and interest
61,116
70,362
81,300
91,733
Reasonably anticipated needs of petitioner for the years 1973 through 1976 for contingent liabilities for federal income tax and interest thereon amounted to not less than the following amounts: 1973
1974
1975
1976
$610,318
$696,041
$799,448
$891,429
In addition, reasonably anticipated needs of petitioner for legal and accounting fees amounted to not less than $100,000 for each of the years 1973 through 1976. From May 18, 1920, until 1977, petitioner neither declared nor distributed any dividends. During 1977, 1978, and the first 2-1/2 months of 1979, petitioner paid the following dividends: Date Paid
Amount
November 1, 1977
$48,000
December 1, 1977
24,000
March 13, 1978
36,000
June 16, 1978
60,000
September 15, 1978
48,000
January 2, 1979
96,000
March 15, 1979
39,600
Respondent determined that petitioner is liable for the accumulated earnings tax *335 imposed by section 531 for each of the years 1973 through 1976 in the following amounts: [8]
1973
1974
1975
1976
$105,894
$237,678
$184,631
$194,697
In the notices of deficiency issued to petitioner, determining the taxes under section 531, respondent determined that petitioner's reasonable business needs for 1973 through 1976 were as follows: 1973
1974
1975
1976
Working Capital
$ 64,756
$183,509
$ 228,617
$ 218,293
State Income Tax and Interest
Federal Income Tax and Interest
610,318
696,041
799,448
841,657
Accumulated Earnings Tax
Plant and Equipment
Legal and Accounting Fees
100,000
100,000
100,000
100,000
Total
$775,074
$979,550
$1,128,065
$1,159,950
Petitioner timely submitted statements, as provided in section 534(c), setting forth the grounds upon which it relied *336 to establish that all or part of its earnings had not been permitted to accumulate beyond the reasonable needs of its business. On September 9, 1981, this Court ruled that the burden of proof is on petitioner as to whether its earnings and profits were permitted to accumulate beyond the reasonable needs of its business. OPINION 1. Entertainment Expenditures
The first issue for our decision is whether petitioner is entitled to deductions for expenses incurred in connection with its entertainment facilities maintained and activities conducted at Ocracoke Island, North Carolina, during the tax years 1968 through 1978, inclusive. Respondent has conceded that the entertainment expenses in question are "ordinary and necessary" business expenses within the meaning of section 162. The pivotal question is, therefore, whether petitioner has satisfied the additional requirements for deduction of entertainment expenses imposed by section 274. Section 274(a)(1)(A) denies any deduction otherwise allowable with respect to an activity generally considered to constitute entertainment, unless the taxpayer shows that the activity was directly related to, or, if the activity directly preceded or *337 followed "a substantial and bona fide business discussion," that the activity "was associated with, the active conduct of the taxpayer's trade or business." During the years in issue, section 274(a)(1)(B) denied any deduction otherwise allowable with respect to a facility used in connection with an entertainment activity, unless the taxpayer showed "that the facility was used primarily for the furtherance of the taxpayer's trade or business and that the" particular expenses were "directly related to the active conduct of such trade or business." [9]
The term "facility used in connection with entertainment" is broadly defined by respondent's regulations to include any personal or real property owned, rented, or used by a taxpayer for, or in connection with, entertainment. Sec. 1.274-2(e)(2)(i), Income Tax Regs.According to section 1.274-2(b)(1)(i), Income Tax Regs., for purposes of section 274, the term "entertainment" means any activity generally considered *338 to constitute "entertainment, amusement, or recreation," including "hunting, fishing, vacation and similar trips." The term "entertainment" also may include any activity that "satisfies the personal, living, or family needs of any individual, such as providing food and beverages, a hotel suite, or an automobile to a business customer * * *" Sec. 1.274-2(b)(1)ni), Income Tax Regs. To qualify as directly related to the active conduct of a taxpayer's trade or business, an expenditure for entertainment must meet the requirements of any one of subparagraphs (3), (4), (5), or (6) of section 1.274-2(c), Income Tax Regs.Section 1.274-2(c)(2), Income Tax Regs. Under section 274(d), the taxpayer has the additional burden of substantiating either by adequate records or by sufficient evidence corroborating his own statement the expenses claimed and the business relationship thereof. Handelman v. Commissioner,509 F.2d 1067, 1072 (2d Cir. 1975), revg. and remanding T.C. Memo. 1973-57. An exception to the rules contained in section 274(a), denying deductions for entertainment-related expenses, is provided by section 274(e)(1) in the case of business meals furnished under circumstances which are *339 generally considered to be conducive to a business discussion. This exception, however, does not relieve a taxpayer from the responsibility of complying with the substantiation requirements imposed by section 274(d). Sec. 1.274-2(f)(1), Income Tax Regs.
In 1977, this Court, in Berkley Machine Works & Foundry Co. v. Commissioner,T.C. Memo. 1977-177, decided that the major portion of the expenses incurred by petitioner in connection with its entertainment facilities maintained and entertainment activities conducted at Ocracoke during the years 1963 through 1967 were deductible, since the expenses were primarily incurred in furtherance of the active conduct of petitioner's business as required by section 274(a) and substantiated as required by section 274(d). The Commissioner appealed from this Court's decision in that case. Berkley Machine Works & Foundry Co. v. Commissioner,623 F.2d 898 (4th Cir. 1980). The Court of Appeals reversed the Tax Court's decision and held that the deductions related to Ocracoke were required to be disallowed under section 274(d) as well as section 274(a). 623 F.2d at 907. With respect to the disallowance of the deductions pursuant to section 274(a), *340 the Court of Appeals stated (623 F.2d at 903-904): We think it clear that the discussions that took place during the Ocracoke weekends, while certainly business-related and undoubtedly of general economic benefit to Berkley, were not properly established on the evidence as directly related to the active conduct of its business as contemplated by the statutory language and history and by the Regulations. Witnesses indicated that the trips were valuable to both sides because they provided an opportunity for the development of personal relationships between employees of customer companies and their contacts at Berkley. This tended to smooth the way for a quick resolution of problems that would arise in the course of the companies' business dealings.The practice of mixing employees from different companies on one trip allowed them to compare notes on things that Berkley was doing for their respective companies and may have, somewhere down the road, generated more income for Berkley. Similarly, it may have saved the company money when customers took advantage of their scheduled fishing weekend to bring up problems that had recently surfaced in production schedules or machine operation. *341 None of this evidence, however, indicates that Berkley had, at the time it arranged or took part in the Ocracoke weekends, more than a "general expectation of deriving some income or other specific trade or business benefit," other than goodwill, at some indefinite future time. Two customers did testify that they had on one or more occasions brought plans or specifications along for the purpose of going over specific projects with Berkley representatives.Though this type of activity may constitute a negotiation or discussion for the purpose of obtaining a "specific trade or business benefit" under * * * [section 1.274-2(c)(3)(ii), Income Tax Regs.], these discussions were not adequately substantiated under § 274(d), as we discuss below. Because these few specific discussions recalled by customers were inadequately substantiated, and the discussions described in the bulk of the trial testimony were informal and general in nature, of the sort that inevitably arise when people whose common bond is business are together, the taxpayer has failed to overcome the presumption stated in * * * [section 1.274-2(c)(3)(iii), Income Tax Regs.] that the active conduct of trade or business is considered *342 not to be the principal character of combined business and entertainment activity on hunting or fishing trips, unless the taxpayer clearlyestablishestothecontrary. We think that Berkley's evidence, consisting of undocumented recollections by witnesses whose memories were clouded by the passage of time so that most could not positively recall even the year when these discussions took place, cannot be considered to establish clearly that the active conduct of business took place on all these occasions. At trial respondent amended his answers in the cases before us to allege that petitioner is collaterally estopped by the decision of the Court of Appeals in Berkley Machine Works & Foundry Co. from denying that its expenses incurred in connection with its entertainment facilities at Ocracoke Island must be disallowed. On brief, respondent merely contends, however, that petitioner has failed to prove that the entertainment activities conducted during the years before us are distinguishable from the entertainment activities considered in Berkley Machine Works & Foundry Co. v. Commissioner,supra, and hence, we are required to reach the same outcome here as the Fourth Circuit reached *343 in that case. Respondent also contends that petitioner has not complied with the requirements of section 274(d) regarding substantiation of the business purpose of each trip to Ocracoke and the business relationship to petitioner of each guest entertained. Petitioner, on the other hand, contends that respondent's claim of collateral estoppel suffers from various fatal procedural infirmities and that, in any event, respondent's claim of collateral estoppel must fail since the evidence submitted in this case is substantially different from the evidence in the earlier proceeding. The landmark case on the application of collateral estoppel in tax cases is Commissioner v. Sunnen,333 U.S. 591(1948). The taxpayer in the Sunnen case was an inventor-patentee. The taxpayer also controlled a corporation with which he entered into four agreements whereby he licensed the corporation to manufacture and sell various devices on which he had applied for patents. In 1929, the taxpayer gave his wife all his right, title, and interest in the first agreement, which was dated January 10, 1928. The taxpayer made substantially identical gifts to his wife of all his right, title, and interest in license *344 agreements entered into in 1931 and 1939. In an earlier proceeding in 1935, the Board of Tax Appeals held that the taxpayer was not taxable on the royalties paid to his wife during the years 1929 to 1931 under the 1928 agreement. The Tax Court held that the taxpayer was taxable on all the royalties received by his wife during the years 1937 to 1941, other than those royalties received under the 1928 agreement. The Tax Court held that the doctrine of res judicata prevented a different result with respect to the 1928 agreement considered in the earlier proceeding.
As to the application of collateral estoppel to the license agreements which had not previously been considered by the Board, the Supreme Court stated: * * * * if the very same facts and no others are involved in * * * [a subsequent proceeding], a case relating to a different tax year, the prior judgment will be conclusive as to the same legal issues which appear, assuming no intervening doctrinal change. But if the relevant facts in the two cases are separable, even though they be similar or identical, collateral estoppel does not govern the legal issues which recur in the second case. Thus the second proceeding may involve *345 an instrument or transaction identical with, but in a form separable from, the one dealt with in the first proceeding. In that situation, a court is free in the second proceeding to make an independent examination of the legal matters at issue. It may then reach a different result or, if consistency in decision is considered just and desirable, reliance may be placed upon the ordinary rule of stare decisis. Before a party can invoke the collateral estoppel doctrine in these circumstances, the legal matter raised in the second proceeding must involve the same set of events or documents and the same bundle of legal principles that contributed to the rendering of the first judgment. * * * It is readily apparent in this case that the royalty payments growing out of the license contracts which were not involved in the earlier action before the Board of Tax Appeals and which concerned different tax years are free from the effects of the collateral estoppel doctrine. That is true even though those contracts are identical in all important respects with the 1928 contract, the only one that was before the Board, and even though the issue as to those contracts is the same as that raised by *346 the 1928 contract. For income tax purposes, what is decided as to one contract is not conclusive as to any other contract which is not then in issue, however similar or identical it may be. * * * [Emphasis supplied. Fn. ref. omitted. 333 U.S. at 601-602.] Although we would agree that petitioner is estopped from relitigating any fact decided in Berkley Machine Works & Foundry Co. v. Commissioner, supra, we do not think that, under the principles set forth in Commissioner v. Sunnen,supra, a decision that petitioner, in 1963 through 1967, failed to satisfy the requirements for deduction of entertainment expenses prescribed by section 274 prevents petitioner from litigating the question whether separable, albeit similar or identical, entertainment expenses incurred by it in 1968 through 1978 must be disallowed under section 274. See Teitelbaum v. Commissioner,346 F.2d 266, 268 (7th Cir. 1965), affg. a Memorandum Opinion of this Court; Jackson v. King,223 F.2d 714, 718-719 (5th Cir. 1955); Beirne v. Commissioner,61 T.C. 268, 275-276 (1973); Consolidated Edison Co. of New York v. United States,162 F. Supp. 854 (S.D.N.Y. 1958), affd. on this point 279 F.2d 152, 153-154 (2d Cir. 1960), *347 affd. 366 U.S. 380 (1961); Branscomb, "Collateral Estoppel in Tax Cases: Static and Separable Facts," 37 Tex. L. Rev. 584 (1959). Notwithstanding that the holding of the Fourth Circuit as to the deductibility of the expenses for entertainment in the years 1963 through 1967 is not determinative of the question here, many of the facts involved in the present case are the same as the facts involved in the earlier case and a number of legal questions presented in this case were presented to the Fourth Circuit in the earlier case. Since there are differences between the present case and the preceding case, however, Golsen v. Commissioner,54 T.C. 742, 756-757 (1970), affd. 445 F.2d 985 (10th Cir. 1971), does not directly apply. Nevertheless, given the fact that this case is appealable to the same Circuit, we think that the principles enunciated by the Court of Appeals in the preceding case should be treated as persuasive authority. Petitioner first argues that it is clear, based upon the evidence in the present case, that its expenditures incurred in connection with the trips to Ocracoke should be considered to be directly related to the active conduct of its trade or business under *348 either section 1.274-2(c)(4), Income Tax Regs., relating to expenditures incurred in a clear business setting, or section 1.274-2(c)(3), Income Tax Regs.
We do not doubt that any recipient of the entertainment furnished by petitioner would have known that petitioner had no significant motive other than promoting its trade or business. See Section 1.274-2(c)(4), Income Tax Regs. Nevertheless, in view of Berkley Machine Works & Foundry Co. v. Commissioner,supra, the entertainment expenditures in question cannot be considered expenditures for entertainment occurring in a clear business setting for the same reasons that the Court of Appeals found that the entertainment expenditures incurred during the years 1963 through 1967 were not made in a clear business setting. As in that prior proceeding, the Ocracoke trips in this case involved large groups of people, some of whom were not business associates, and a setting where the distractions for sportsmen were substantial. Berkley Machine Works & Foundry Co. v. Commissioner,supra, at 905, n.8. Section 1.274-2(c)(3), Income Tax Regs., provides that, an expenditure shall be considered directly related to the active conduct of the taxpayer's *349 trade or business, if it is shown that the taxpayer had more than a general expectation of deriving some income or other specific trade or business benefit from the expenditure, other than the goodwill of the person or persons entertained. It also provides that, during the entertainment period, the taxpayer must have actively engaged in a business meeting, negotiation, discussion, or other bona fide business transaction, other than entertainment, in order to obtain such income or other specific trade or business benefit. To satisfy the regulation, the taxpayer also must establish that the principal character or aspect of the combined business and entertainment, in light of all the circumstances, was the active conduct of its trade or business. If the combined business and entertainment activity occurs on Hunting or fishing trips, the regulation creates a presumption that the principal character or aspect of the combined activity is not the active conduct of the taxpayer's trade or business. To rebut the presumption, the taxpayer must clearly establish to the contrary. Recognizing that the evidence presented in Berkley Machine Works & Foundry Co. v. Commissioner,supra, was insufficient *350 to convince the Court of Appeals that petitioner had, when it arranged or participated in the trips to Ocracoke, more than a "general expectation of deriving some income or other specific trade or business benefit," besides goodwill, [10] *351 at some indefinite future time, petitioner argues that the evidence presented here is sufficiently distinguishable from that presented in the earlier case to mandate a decision that the expenses in question qualify under section 1.274-2(c)(3), Income Tax Regs. Petitioner makes its argument based upon (1) the parties' stipulation that petitioner entered into 4,732 contracts with its major customers during the 11-year period from 1968 through 1978 and (2) a catalog indicating the numbers of the contracts petitioner entered into with its major customers and the month during which each of the contracts was entered into. The foregoing argument of petitioner is without merit. Although it appears that no evidence was submitted in the earlier proceeding concerning how many contracts petitioner entered into with its major customers and when each contract was entered into, a reading of our opinion and the Court of Appeals' opinion in the earlier case indicates that evidence of the amount of petitioner's sales to its major customers and of petitioner's ongoing relationships with such customers was in the record. Among our findings of fact (T.C. Memo. 1977-177) was a chart depicting the amount of petitioner's sales to each of its major customers and to its other customers during each of the years 1963 through 1967. *352 Moreover, the Court of Appeals commented that the ongoing business relationships between petitioner's sales representatives and individuals who were employees of its major customers may have led to discussions that were more concrete than those indicated by the facts in other cases. 623 F.2d at 905. Although business activity undeniably took place during the Ocracoke fishing and/or hunting trips, petitioner has not established that the trips were "directly related to" the active conduct of its trade or business, in that it has failed to clearly establish that the principal character or aspect of the trips was the active conduct of its trade or business. The bulk of the evidence indicates that petitioner's purpose, in entertaining employees of its customers, was to create goodwill among customers and to cement business relationships.Formal or group business meetings are mentioned in few of the trip reports (approximately six percent). In addition, most of those meetings took place on only a single evening of six or seven days of combined business and entertainment. Although more time need not be devoted to business than to entertainment to satisfy the requirement that the principal *353 character of entertainment to which an expenditure relates be the active conduct of the taxpayer's trade or business, sec. 1.274-2(c)(3)(iii), Income Tax Regs., it asks too much of us to consider the active conduct of petitioner's trade or business to be the principal character of these six or seven-day fishing and/or hunting trips. The trip reports for approximately 94 percent (or nearly 130) of the occasions on which petitioner entertained employees of its customers contain no reference to business meetings or negotiations in which petitioner engaged. It is clear from the Fourth Circuit's opinion in Berkley Machine Works & Foundry Co. v. Commissioner,supra, that evidence of general business discussions of the type that "inevitably arise" when businessmen with an ongoing relationship are together will not rebut the presumption created by section 1.274-2(c)(3)(iii), Income Tax Regs. 623 F.2d at 904. Here, some of petitioner's trip reports establish that business discussions on the trips to which they relate fall into that category, having arisen at "opportune times" (or "whenever there was a suitable opportunity"). Most of petitioner's remaining trip reports, aside from those reports *354 discussed above which mention formal or group meetings, do not state in what context discussions concerning business arose. Since the burden of proving error in respondent's determination is upon petitioner, we must presume that the conversations mentioned in those remaining reports were the sort of general business discussions that "inevitably arise" among men whose common bond is business. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a). Finally, here as in Berkley Machine Works & Foundry Co. v. Commissioner,supra, the indirect relationship between the Ocracoke excursions and the active conduct of petitioner's business is also manifested by other factors, such as the size of some of the groups entertained, the presence of nonbusiness associates on some trips, and the pleasurable distractions at Ocracoke. 623 F.2d at 905. As to certain out-of-pocket expenditures, such as those for food and beverages, for which deductions may not be disallowed by section 274(a)(1)(A), although they are not "directly-related" expenditures, Berkley Machine Works & Foundry Co.,supra, must be followed here. In holding that petitioner's expenditures for entertainment in 1963 through 1967 were *355 disallowed under section 274(a)(1)(A) (as well as under section 274(a)(1)(B)), the Fourth Circuit stated therein: The Ocracoke weekends clearly do not come within the statute's contemplation of entertainment that takes place purely as an adjunct to formal business meetings. Nor do we consider that expenses may qualify under the test when the claimed business discussions take place during the course of a combined social/business function. * * * 623 F.2d at 905. We conclude that section 274(a), as interpreted by the Fourth Circuit in Berkley Machine Works & Foundry Co. v. Commissioner,supra, bars deduction of the expenses incurred in connection with the entertainment facilities maintained and activities conducted at Ocracoke. [11] *356 *357 *358 Petitioner contends that deductions for depreciation of its facilities maintained at Ocracoke should be allowed since the facilities were used solely to furnish meals and sleeping accommodations to its guests, not to engage in the activity of fishing. In this connection, petitioner contends that the only facilities used in connection with the entertainment, viz, the fishing, were boats owned by other individuals and rented by petitioner for a fee. Petitioner alternatively argues that if expenditures for meals and sleeping accommodations furnished to its guests are not deductible, deductions for depreciation, nevertheless, should be permitted for the portion of time its facilities were not used during each of the years 1968 through 1978, inclusive. In support of this argument, petitioner cites Ashby v. Commissioner,50 T.C. 409 (1968), and P. Dougherty Co. v. Commissioner,5 T.C. 791 (1945), affd. 159 F. 2d 269 (4th Cir. 1946), for the proposition that depreciation is allowable even if an asset is not used, if the asset is used primarily for the furtherance of the taxpayer's business. As noted *359 in our Findings, the parties have stipulated that petitioner's Ocracoke Island facilities were "used primarily for the furtherance of petitioner's business." Petitioner's contention that its facilities maintained at Ocracoke were not facilities used in connection with an activity generally considered to constitute entertainment, amusement, or recreation within the meaning of section 274(a)(1)(B) ignores the plain import of respondent's regulations under section 274. See section 1.274-2(b)(1)(i) and section 1.274-2(e)(2)(i), Income Tax Regs. Those regulations clearly contemplate that any real property used by a taxpayer in connection with "hunting, fishing, vacation and similar trips," such as petitioner's Ocracoke facilities, fall within the ambit of section 274(a)(1)(B). Cf. Ma-Tran Corp. v. Commissioner,70 T.C. 158, 169-170 (1978). [12]
We also are unable to agree with petitioner's assertion that deductions for depreciation should be allowed for the portion of time its facilities were not used during each of the years under review. As noted earlier, in order for a taxpayer to obtain a deduction for any item related *360 to an entertainment facility, he must demonstrate that the facility was primarily used for the furtherance of his trade or business. The deduction will be disallowed, however, if the item was not directly related to the active conduct of such trade or business. Section 1.274-2(e)(4)(i), Income Tax Regs., provides that, in determining whether an entertainment facility was primarily used in furtherance of a taxpayer's trade or business, generally only the actual use of the facility shall be considered. Although that regulation is not directly applicable, we have previously applied the principle underlying it to decide the portion of a facility devoted to business use, as opposed to personal use. See International Artists, Ltd. v. Commissioner,55 T.C. 94, 107 (1970). [13] Thus, in determining the comparative business and personal use of an entertainment facility, days of nonuse of the facility are irrelevent. Under section 274(g), a taxpayer's use of a facility for purposes for which a deduction is disallowed under section 274(a) is deemed to be for personal, living, and family purposes. See sec. 262. Since we have concluded that *361 deductions for expenditures incurred in connection with petitioner's use of its facilities maintained at Ocracoke are disallowed by section 274(a), it follows that petitioner is entitled to no deductions for depreciation. Secs. 167, 262, and 274(g). Petitioner finally contends that it is entitled to deduct its expenditures for food or beverages furnished to its guests, including depreciation on its Ocracoke facilities, under section 274(e)(1) and the corresponding regulations. Respondent, on the other hand, claims that section 1.274-2(f)(2)(i), Income Tax Regs., indicates that the so-called "quiet business meal" exception allows the deduction only of expenditures for food or beverages supplied to an individual during a business meeting or a normal business day and, thus, not of expenditures for meals served during a fishing trip. On the basis of the record before us, we are unable to conclude that petitioner's expenditures for food and beverages fall within the exception to section 274(a) contained in section 274(e)(1).
In determining whether food and beverages were furnished under circumstances generally considered to be conducive to a business discussion, we must take into account *362 the relationship to the taxpayer's business of the persons to whom the food and beverages are furnished. Section 274(e)(1). The regulations provide that, generally, the quiet business meal exception is not applicable to meals or beverages furnished in an atmosphere where there are substantial distractions to business discussions, such as large cocktail parties or sizeable social gatherings. Sec 1.274-2(f)(2)(i)(b) Income Tax Regs. As we indicated earlier in connection with our discussion of petitioner's argument concerning its expenditures having been incurred in a clear business setting, petitioner's Ocracoke trips involved large groups of people, including some people who definitely were not business associates. In addition, other people who have not been established by petitioner to be business associates as defined by section 1.274-2(b)(2)(iii), Income Tax Regs., took part in the Ocracoke weekends. [14] *363 Petitioner states that ample support for its position *364 is contained in Howard v. Commissioner,T.C. Memo. 1981-250. In that case, we found that "the time and circumstances of thd dinner[s] as well as the individual and collective professional interests of the few guests invited" made it clear that the expenditures incurred by the taxpayer for the dinners involved fell within section 274(e)(1). Plainly, our opinion in the Howard case was based on the record therein and, thus, it is not helpful to petitioner's argument here. Since we have concluded that the deductions in question are disallowed by section 274(a) and do not fall within the ambit of section 274(e)(1), we do not reach the question whether petitioner has met the substantiation requirements of section 274. 2. Accumulated Earnings Tax
The remaining issue for decision is whether petitioner is liable for accumulated earnings taxes, pursuant to section 531, for each of the years 1973 through 1976. The accumulated earnings tax is imposed on the "accumulated taxable income" of those corporations formed or availed of for the purpose of avoiding tax liability with respect to their shareholders by permitting earnings and profits to accumulate instead of being distributed. Secs. *365 531 and 532. If a corporation permits its earnings and profits to accumulate beyond its reasonable business needs, section 533 gives rise to a presumption that the interdicted purpose is present. That presumption is determinative of the proscribed purpose unless the taxpayer by a preponderance of the evidence proves to the contrary. Sec. 533. The term "accumulated taxable income" is defined by section 535(a) as taxable income, with certain adjustments, reduced by the sum of the dividends paid deduction provided by section 561 and the "accumlated earnings credit" as defined by section 535(c). The accumulated earnings credit, as a general rule, is an amount equal to that part of the earnings and profits of the current year which are retained for the corporation's reasonable business needs. Sec. 535(c). It follows from the foregoing that a determination of petitioner's reasonable business needs is important for two reasons: (1) to determine whether the proscribed purpose is presumed to be present pursuant to section 533 and (2) to calculate the amount of the credit for earnings and profits of the years in question retained to meet petitioner's reasonable business needs. Whether *366 a corporation has accumulated earnings beyond its reasonable business needs is a question of fact to be determined with reference to the conditions existing in the year of accumulation. Bremerton Sun Publishing Co. v. Commissioner,44 T.C. 566, 582 (1965). It is not the magnitude of the accumulation, but rather whether the accumulation exceeds the corporation's reasonable business needs, which is determinative. Smoot Sand & Gravel Corp. v. Commissioner,274 F.2d 495, 500 (4th Cir. 1960), affg. a Memorandum Opinion of this Court; Faber Cement Block Co. v. Commissioner,50 T.C. 317, 328 (1968). In determining whether petitioner has allowed its earnings and profits to accumulate beyond its reasonable business needs, a simple comparison of petitioner's reasonable business needs with its total accumulated earnings will not suffice. Since some of petitioner's accumulated earnings may have been converted into illiquid assets, such as business plant and equipment, and thus not have been available for dividends, we must, instead, compare petitioner's reasonable business needs with its net liquid assets. See Ivan Allen Co. v. United States,422 U.S. 617, 628 (1975); Smoot Sand & Gravel Corp. v. Commissioner,supra at 501; *367 Montgomery Co. v. Commissioner,54 T.C. 986, 1008 (1970). Petitioner contends that $800,000 of its accumulation was needed during each of the years 1973 through 1976 "to provide funds for renovation of plant and for new equipment." Respondent at least tacitly concedes that petitioner needed to replace its old equipment and to build a new building and that its board of directors anticipated these needs as early as 1972. Respondent contends, however, that petitioner's plans to expand its plant and to acquire new equipment were too vague and uncertain during the years 1973 through 1976 to warrant an accumulation of earnings and that no action had been taken in furtherance of those plans. Respondent further contends that assuming, arguendo, that petitioner had a concrete plan to expand its plant and acquire equipment during 1973 through 1976, the plan did not require a substantial accumulation inasmuch as "petitioner funded almost all of its plant expansion and equipment acquisition through depreciation," rather than through accumulated earnings. Section 537(a)(1) provides that the term "reasonable needs of the business" encompasses reasonably anticipated needs of the business. Section 1.537-1(b), Income Tax Regs., *368 provides guidance concerning the tests a corporation must meet to justify an accumulation for reasonably anticipated needs: (b) Reasonably anticipated needs. (1) In order for a corporation to justify an accumulation of earnings and profits for reasonably anticipated future needs, there must be an indication that the future needs of the business require such accumulation, and the corporation must have specific, definite, and feasible plans for the use of such accumulation.Such an accumulation need not be used immediately, nor must the plans for its use be consummated within a short period after the close of the taxable year, provided that such accumulation will be used within a reasonable time depending upon all the facts and circumstances relating to the future needs of the business. Where the future needs of the business are uncertain or vague, where the plans for the future use of an accumulation are not specific, definite, and feasible, or where the execution of such a plan is postponed indefinitely, an accumulation cannot be justified on the grounds of reasonably anticipated needs of the business. (2) Consideration shall be given to reasonably anticipated needs as they exist *369 on the basis of the facts at the close of the taxable year. Thus, subsequent events shall not be used for the purpose of showing that the retention of earnings or profits was unreasonable at the close of the taxable year if all the elements of reasonable anticipation are present at the close of such taxable year. However, subsequent events may be considered to determine whether the taxpayer actually intended to consummate or has actually consummated the plans for which the earnings and profits were accumulated. In this connection, projected expansion or investment plans shall be reviewed in the light of the facts during each year and as they exist as of the close of the taxable year. If a corporation has justified an accumulation for future needs by plans never consummated, the amount of such an accumulation shall be taken into account in determining the reasonableness of subsequent accumulations. In other words, the regulations require that the corporation have a need which requires an accumulation and a specific, definite, and feasible plan for the use of the accumulation to satisfy such need. It is not necessary that the taxpayer have meticulously drawn blueprints for action *370 or formal minutes detailing its plans. Faber Cement Block Co. v. Commissioner,supra at 332; John P. Scripps Newspapers v. Commissioner,44 T.C. 453, 469 (1965). Instead, the test is whether the plans were "a real consideration during the taxable year, and not simply an afterthought to justify challenged accumulations." Faber Cement Block v. Commissioner,supra.As stated in Henry Van Hummell, Inc. v. Commissioner,364 F. 2d 746, 750 (10th Cir. 1966), "The purpose for retention thus must be expressed in some tangible way or by some action directed towards its fulfillment." See also Brookfield Wire Co. v. Commissioner,T.C. Memo. 1980-321, affd. on another issue 667 F.2d 551 (1st Cir. 1981). Petitioner has failed to carry its burden of proving that it had a specific, definite, and feasible plan for expansion as of the close of the taxable years 1973 and 1974. Although petitioner's board of directors recognized the need for a new facility on March 8, 1972, the corporate minutes of March 8, 1972, indicate that it resolved only to start plans for a new building when sufficient funds were set aside in petitioner's reserve account. (emphasis added.) Petitioner argues that its deposit of *371 funds to a "Machinery Reserve Account" at United Virginia Bank and its purchase and assembly of 8 lots on which it constructed its new facility demonstrate that its plan was definite and feasible. There is no evidence, however, regarding petitioner's "Machinery Reserve Account" other than the reference to it in petitioner's minutes of March 8, 1972. Petitioner's unsupported assertion on brief concerning deposits having been made to the account cannot take the place of evidence. See Smoot Sand & Gravel Corp. v. Commissioner,supra, at 498. In 1973 petitioner did not acquire any of the parcels of land which compose the lot upon which its new plant was eventually built. Although one of the parcels was purchased by petitioner in 1974, we are not persuaded that petitioner had specific, definite, and feasible plans to expand as of the end of 1974. See Thompson Engineering Co. v. Commissioner,80 T.C. 672 (1983) (finding that there was no persuasive evidence that the taxpayer had specific, definite, and feasible plans to expand as of August 31, 1972, notwithstanding that the taxpayer's president was authorized by its board of directors on August 10, 1968, to proceed with construction *372 of a new building "as soon as time and money would permit" and sometime between August 10, 1968, and August 9, 1969, the taxpayer purchased a lot adjoining its existing building). [15]
We are satisfied that by the end of 1975 petitioner's plans for construction of a new building were specific, definite, and feasible. Petitioner's purchase of 3 additional parcels during the year 1975 indicates that its plans to construct a new plant were "a real consideration during the taxable year." See Faber Cement Block Co. v. Commissioner,supra at 332-333; Brookfield Wire Co. v. Commissioner;supra. It is clear that petitioner could not have executed its plans for a new plant without having purchased the lots, which were used as part of the site of the new plant. In August 1977, only a little over 7 months after the close of the most recent year still in issue, a construction contract was let for a new plant and, in 1977 and 1978, the new plant was *373 constructed pursuant to such contract. Certainly, it did not just happen that petitioner had the lots required for the construction of its new plant. Rather, we think that petitioner's formation of the site on which its plant was constructed entailed forethought and planning on the part of those who controlled its actions. See Atlas Tool Co. v. Commissioner,70 T.C. 86, 119 (1978), affd. 614 F.2d 860 (3d Cir. 1980). The evidence shows that in 1972 petitioner's board of directors anticipated that the cost of petitioner's new building would be $300,000. In 1977, the total cost of construction was estimated to be $380,200. On this record, we conclude that petitioner reasonably anticipated the need to accumulate $300,000 for construction of its new plant in 1975 and 1976. We do not believe that petitioner has shown that it had a specific and definite plan to acquire new equipment during 1973 and 1974. On March 8, 1972, petitioner's board of directors was presented a survey of its plant equipment which recognized that some of petitioner's machine tools were approaching antiquity and which recommended alternative proposals for dealing with the problem. The corporate minutes of March *374 8, 1972, refer to the survey of petitoner's equipment and recognize a need for $2,246,450 to replace old, obsolete equipment. Nevertheless, the corporate minutes do not indicate which, if any, of the proposals contained in the survey petitioner's board of directors planned to implement. In addition, none of the proposals recommended by the survey were estimated to cost any amount near $2,246,450. The corporate minutes of March 8, 1972 also state that equipment for a new "building would cost an estimated half million dollars.? Petitioner's recognition of its need to replace old, obsolete equipment and consideration of alternative ways to meet that need is insufficient. Henry Van Hummell, Inc. v. Commissioner,supra at 750. A definite plan coupled with action toward its execution are essential. Dixie, Inc. v. Commissioner,277 F.2d 526, 528 (2d Cir. 1960), affg. 31 T.C. 415 (1958). [16] It has not been established that petitioner had the requisite plan for equipment replacement. Moreover, although petitioner did in fact acquire new equipment costing $500,641 in 1978, [17] it has failed to establish that such equipment was purchased to replace its old, obsolete equipment, rather than *375 to outfit its new plant. For the reasons discussed above in connection with the year when petitioner first had specific, definite, and feasible plans to construct a new plant, we have concluded that petitioner has not established that it had specific, definite, and feasible plans to acquire equipment for a new plant during 1973 and 1974. We conclude that petitioner had reasonable business needs for equipment for its new plant as of the end of the years 1975 and 1976 to the extent of $500,000. Respondent's argument that petitioner's needs for a new plant and equipment were funded through depreciation demonstrates a misunderstanding on his part concerning the concepts underlying depreciation accounting. Depreciation entries are merely book entries, *376 which are intended to promote the integrity of periodic income statements by allocating in a meaningful way the cost (excluding maintenance expense) of an asset previously acquired to the periods to which the asset contributes. Massey Motors, Inc. v. United States,364 U.S. 92, 104 (1960); Finney and Miller, Principles of Accounting: Introductory 293 (5th ed 1957). As such, depreciation entries do not increase the amount of cash available for replacement of fixed assets. Finney and Miller, supra.
Petitioner contends that, as a result of past difficulties with the Internal Revenue Service, it needed to retain $105,894, $343,572, and $528,203 in the years 1974, 1975 and 1976, respectively, to meet the probability that the Internal Revenue Service would assert accumulated earnings tax liabilities. Respondent contends that petitioner cannot show that it reasonably anticipated the need until 1977, when the accumulated earnings tax liabilities were actually asserted.
As we assess the situation, having found that petitioner reasonably anticipated the need to retain $800,000 for construction of a new plant and acquisition of equipment at the end of the years 1975 and 1976, it is unnecessary *377 for us to consider whether contingent liabilities for accumulated earnings tax were a reasonable need for which petitioner might provide as of December 31, 1975, and December 31, 1976. (See the table on page 61, infra.) See Montgomery Co. v. Commissioner,54 T.C. 986, 1010 (1970). It is well settled that a contingent liability may be a reasonable need for which a business may provide. Bremerton Sun Publishing Co. v. Commissioner,44 T.C. 566, 586 (1965); William C. Atwater & Co. v. Commissioner,10 T.C. 218 (1948). The likelihood of the contingency's occurrence determines whether it is reasonably anticipated. Smoot Sand & Gravel Corp. v. Commissioner,241 F.2d 197, 206 (4th Cir. 1957), modifying a Memorandum Opinion of this Court; Alma Piston Co. v. Commissioner,T.C. Memo. 1976-107, affd. 579 F.2d 1000 (6th Cir. 1978). The only hint in the record that petitioner feared adverse circumstances could take place as a result of its tax return for 1973 being audited is contained in the minutes of a special meeting of petitioner's board of directors held on June 4, 1975, [18] i.e., more than 5 months after 1974. The record before us, being singularly devoid of evidence as to whether petitioner's *378 directors and/or officers were concerned about (or even aware of) the possibility of petitioner's liability for accumulated earnings tax in 1973 and 1974, does not permit us to conclude that petitioner retained earnings in 1973 and 1974 to meet the possible imposition of the tax. [19] *379 See Charles O. Finley & Co. v. Commissioner,T.C. Memo. 1982-354. Business Needs Compared to Net Liquid Assets.
The following table compares our conclusions as to petitioner's reasonable business needs with petitioner's net liquid assets available to meet these needs as of the close of the taxable years 1973, 1974, 1975, and 1976. Taxable Year Ended December 31
1973
1974
1975
1976
I. Needs
A. Working Capital
$ 255,709
$ 266,720
$ 452,637 $ 445,623 B. Prior
Federal Income
Tax Deficiencies
610,318
696,041
799,448 891,429 (Including Interest)
C. Prior State Income
Tax Deficiencies
61,116
70,362
81,300 91,733 (Including Interest)
D. Accumulated Earnings
Tax
E. Plant and Equipment
800,000 800,000 F. Legal and Accounting
Fees
100,000
100,000
100,000 100,000 Total Needs
$1,027,143
$1,133,123
$2,233,385 $2,328,785 II. Petitioner's net
liquid assets
1,097,328
1,764,129
1,730,676 2,287,270 (page 29, supra)
III. Surplus (Deficit)
$ 70,185
$ 631,006
($ 502,709)
($ 41,515)
The *380 foregoing chart clearly indicates that during the years 1973 and 1974 petitioner permitted its earnings and profits to accumulate beyond its reasonable business needs. Petitioner has presented no evidence to rebut the presumption created by section 533 that such accumulation is determinative of the purpose to avoid tax at the shareholder level. Instead, petitioner only argued that its accumulations were justified by the pressing needs of its business.Since we have found that the evidence does not wholly support petitioner's argument, we must perforce uphold respondent's determination that petitioner was formed or availed of during the years 1973 and 1974 for the purpose of avoiding the income tax with respect to its shareholders by permitting earnings and profits to accumulate instead of being distributed. Inasmuch as the foregoing chart indicates that petitioner's business needs exceeded its net liquid assets for the years 1975 and 1976, we need not consider whether petitioner was availed of for the proscribed purpose in those years. John P. Scripps Newspapers v. Commissioner,44 T.C. 453, 474 (1965). This is so because the accumulated earnings credit provided for in section 535(c) *381 would be equal to the full amount of petitioner's current earnings and profits retained in those years, thus resulting in accumulated taxable income equal to zero. We, therefore, hold that petitioner is not liable for accumulated earnings taxes for each of the years 1975 and 1976. See Chaney and Hope, Inc. v. Commissioner,80 T.C. 263, 281 (1983) and the cases cited thereat. Our holding with respect to the year 1976 makes it unnecessary for us to consider petitioner's contention concerning (1) its need for an accumulation in that year of $200,000 to cover anticipated legal and accounting fees and (2) the affect of a portion of a deficiency in its income tax, resulting from its failure to satisfy the requirements for postponing recognition of gain under section 1033, on the calculation of its accumulated taxable income for 1976. Decisions will be entered under Rule 155.
Footnotes
1. The increase of $14,623.50 in the deficiency is attributable to the inclusion by respondent of a capital gain of $48,745, which petitioner realized upon the condemnation of some of its real property. Petitioner agrees that its taxable income for 1974 should be increased by $48,745.↩
2. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue and all references to Rules are to the Tax Court Rules of Practice and Procedure.↩
3. In 1973, Drill Carrier Corporation was purchased by the Gardner-Denver Corporation. Prior to the merger, Gardner-Denver was the primary marketing force for Drill Carrier's product.↩
4. Mr. Weber usually conducted a group meeting on one evening during each of the trips for the customers serviced by him. Each Ocracoke trip for his customers was 6 or 7 days long. Mr. Weber represented petitioner on july 6 trips, the last of which was in 1974.↩
5. The dates of those 14 trip reports are as follows: October 9-12, 1969; May 7-10, 1970; June 19-21, 1970; October 2-4, 1970; June 4-6, 1971; June 26-July 1, 1971; May 18-21, 1972; June 16-23, 1972; August 24-27, 1972; May 10-12, 1973; June 22-29, 1973; June 23-25, 1977; October 13-16, 1977; and June 9-11, 1978. 6. Those orders were received on the trips during May 7-10, 1970; June 19-21, 1970; and June 4-6, 1971.↩
7. On one trip (September 17-19, 1976) picture slides, although available, could not be shown because the light in the viewer was not functioning.↩
8. Respondent also determined that, for the taxable year 1978, petitioner was formed or availed of for the purpose of avoiding the income tax with respect to its shareholders by permitting earnings and profits to accumulate instead of being distributed. In his brief, he has conceded, however, that under sections 535(a) and (c)(1) petitioner had no "accumulated taxable income" in the year 1978 upon which to base an accumulated earnings tax. See section 531.↩
9. Section 274(a)(1)(B) was amended by section 361(a) of the Revenue Act of 1978, Pub. L. 95-600, 92 Stat. 2847, to disallow entirely deductions relating to entertainment facilities for taxable years ending after December 31, 1978.↩
10. Petitioner argues that, inasmuch as "goodwill is generally not considered to be, 'an ordinary and necessary business expense,'" respondent's contention that petitioner entertained at Ocracoke primarily to derive the goodwill of the individuals entertained is at odds with his concession that the expenses for Ocracoke weekends are ordinary and necessary business expenses under section 162. The fallacy in petitioner's argument is readily apparent from an examination of it. Although expenses for creating goodwill have generally been held not to constitute ordinary and necessary business expenses, that rule is subject to a number of exceptions. See sec. 1.162-20(a)(2), Income Tax Regs.↩; 4A Mertens, Law of Federal Income Taxation, sec. 25.38 (1979 rev.). We see no inconsistency between respondent's contention and his concession.
11. We agree with petitioner that its sales representatives had to use different methods to secure orders than the methods used by wholesalers or retailers of finished products. Nonetheless, petitioner's contention that its business was so unique as to place it in a category by itself is of no help to it in this case. In this regard, we refer petitioner to section 1.274-2(b), Income Tax Regs., which states in pertinent part: (b) Definitions - (1) Entertainmentdefined - (i) In general. For purposes of this section, the term "entertainment" means any activity which is of a type generally considered to constitute entertainment, amusement, or recreation, such as entertaining at night clubs, cocktail lounges, theaters, country clubs, golf and athletic clubs, sporting events, and on hunting, fishing, vacation and similar trips including such activity relating solely to the taxpayer or the taxpayer's family. * * * (ii) Objectivetest.An objective test shall be used to determine whether an activity is of a type generally considered to constitute entertainment. Thus, if an activity is generally considered to be entertainment, it will constitute entertainment for purposes of this section and section 274 (a) regardless of whether the expenditure can also be described otherwise, and even though the expenditure relates to the taxpayer alone. This objective test precludes arguments such as that "entertainment" means only entertainment of others or that an expenditure for entertainment should be characterized as an expenditure for advertising or public relations. However, in applying this test the taxpayer's trade or business shall be considered.Thus, although attending a theatrical performance would generally be considered entertainment, it would not be so considered in the case of a professional theater critic, attending in his professional capacity. Similarly, if a manufacturer of dresses conducts a fashion show to introduce his products to a group of store buyers, the show would not be generally considered to constitute entertainment. However, if an appliance distributor conducts a fashion show for the wives of his retailers, the fashion show would be generally considered to constitute entertainment. [Emphasis supplied.] The quoted language of the regulation is consistent with the legislative history of section 274, S. Rept. 1881, 87th Cong. 2d Sess. (1962), 1962-3 C.B. 707, 733-734 (stating "with respect to a taxpayer whose trade or business consists of selling machine tools * * * a hunting trip generally would be considered a recreation-type activity"); H.R. Rept. 1447, 87th Cong., 2d Sess. (1962), 1962-3 C.B. 405, 424. See Walliser v. Commissioner,72 T.C. 433. 439, n.5. (1979). Moreover, the Fourth Circuit in Berkley Machine Works & Foundry Co. v. Commissioner, supra, accepted the finding of this Court that media advertising is of limited usefulness in a business such as petitioner's business. 623 F.2d at 900↩.
12. See Superior Container, Inc. v. Commissioner,T.C. Memo 1980-434↩.
13. See Hilliker v. Commissioner,T.C. Memo. 1972-183↩.
14. Implicit in the Fourth Circuit's opinion in Berkley Machine Works & Foundry Co. v. Commissioner,supra, is the proposition that not every individual who is employed by a company which is a customer of a taxpayer has a business relationship to the taxpayer. See 623 F.2d at 907. In fact, the record in this case indicates that petitioner's method of inviting entertainees resulted in individuals who were employed by its customers, but who clearly had no business dealings with petitioner, being included in the groups entertained. See table 1 and the text related thereto. Whether certain other employees of petitioner's customers who participated in the Ocracoke trips, although designated as being engineers, maintenance supervisors, foremen, managers, superintendents, mechanics, or the like, were in positions which caused petitioner to reasonably expect to engage or deal in the active conduct of its business with those employees, is unclear from the record. See Sec. 1.274-2(b)(2)(iii), Income Tax Regs. The aforementioned designations certainly suggest that petitioner mighthave expected to engage or deal in the active conduct of its business with the employees so designated. Nevertheless, that suggestion is insufficient to meet petitioner's burden of proof that the individuals were business associates or persons closely connected with business associates. Welch v. Helvering,290 U.S. 111↩ (1933); Rule 142(a).
15. See Barrow Manufacturing Co. v. Commissioner,294 F.2d 79↩ (5th Cir. 1961) (no definite plan where the taxpayer had purchased "adjoining property for the modest sum of $2,500, intending to use the land as part of the situs of the future plant * * *.")
16. See Suwannee Lumber Manufacturing Co. v. Commissioner,T.C. Memo. 1979-477↩. 17. We note that a depreciation schedule submitted as a joint exhibit shows that petitioner also acquired equipment having a cost or other basis of $35,869.40, $5,054.25, and $42,000.85 in 1974, 1975 and 1977, respectively. Petitioner did not argue, or produce any evidence to show, that it had any plans to acquire the equipment that was in fact acquired in those years.↩
18. Those minutes read, in pertinent part, as follows: [The board of directors] * * * reflected on the tax case pending for the years 1963 through 1967, as well as the alleged tax due for years 1968 through 1974. In view of the economic conditions and the potential tax liability, the board of directors decided to continue to accumulate cash reserves sufficient to continue operations in case of adversity. ↩
19. The case relied on by petitioner, Marie's Shoppe, Inc. v. Commissioner,T.C. Memo. 1977-381, concerns a situation that differs substantially from the circumstances in question here, and is, therefore, not supportive of petitioner's position. The taxpayer in Marie's Shoppe, Inc. asserted that it needed to retain its earnings and profits in 1973 to provide for, inter alia, the possible imposition of an accumulated earnings tax for the taxable year 1971. We found as a fact, in Marie's Shoppe, Inc., that the taxpayer, to whom the Commissioner had sent a statement pursuant to section 534(b) on December 2, 1973, had become aware in 1973 that the Commissioner might impose an accumulated earnings tax for its taxable year 1971. In addition, we cannot agree with petitioner that the Business Needs Compared to to the argument advanced by him in the present case. In that case, respondent's argument, which we rejected, was that it was unreasonable for petitioner to consider the proposed tax to be a contingent liability, since the notification issued pursuant to section 534(b) did not specify the amount of the proposed tax.↩